D.L. Anderson's Lakeside Leisure Co., Inc., M. Scott Statz and Steven Statz, Plaintiffs-Respondents-Petitioners,

v.

Donald Anderson and Anderson Marine, LLC, Defendants-Appellants-Cross Petitioners.

Supreme Court

*No. 2007AP46. Oral argument September 10, 2008. —Decided December 2, 2008.*

2008 WI 126

(Also reported in 757 N.W.2d 803.)

566

For the plaintiffs-respondents-petitioners there were briefs by *Kevin J. Palmersheim, Teresa K. Kobelt*, and *Haley Palmersheim*, S.C., Middleton, and oral argument by *Kevin J. Palmersheim*.

For the defendants-appellants-cross petitioners there were briefs by *Michael B. Van Sicklen, Bree Grossi Wilde*, and *Foley & Lardner LLP*, Madison, and oral argument by *Michael B. Van Sicklen* and *Bree Grossi Wilde*.

¶ 1. N. PATRICK CROOKS, J. This is a review of a published court of appeals decision[1] concerning breach of contract and tradename infringement claims related to a business purchase agreement. The court of appeals affirmed the jury verdict finding breach and infringement but reversed the award of compensatory and punitive damages for tradename infringement, and remanded to the circuit court with an order that the attorney fee award be reduced.

¶ 2. Petitioners Scott and Steven Statz (the Statzes)[2] sought review of the court of appeals' decision on damages and attorney fees. Cross-petitioners Donald Anderson (Anderson) and Anderson Marine, LLC, sought review of those portions of the court of appeals'

[1] *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2007 WI App 269, 306 Wis. 2d 470, 744 N.W.2d 300.

[2] D.L. Anderson's Lakeside Leisure Co., Inc., is also a party to this case. We will refer to all of the plaintiffs-respondents-petitioners collectively as "the Statzes."

decision that affirmed the jury's finding of tradename infringement, breach, and damages from the breach, as well as the circuit court's award of attorney fees related to the breach.

¶ 3. For the reasons set forth below, we affirm in part and reverse in part the decision of the court of appeals. We agree with the court of appeals that there was sufficient evidence for the verdict that Anderson breached the Asset Purchase Agreement's noncompetition clause, and for the award of compensatory damages on that claim. We agree, too, that once the jury found breach, the circuit court properly extended the duration of the noncompetition clause in accordance with the purchase agreement. We also agree with the court of appeals that there was sufficient evidence on which the jury could find that Anderson infringed on the Statzes' tradename.

¶ 4. However, we disagree with the decision of the court of appeals holding that there was insufficient evidence to support compensatory and punitive damages on the tradename infringement claim. We are satisfied that the evidence is sufficient to support the compensatory and punitive damage awards, and we reverse the decision of the court of appeals in regard to those matters. We also reverse the court of appeals' decision to limit the attorney fees award to those attributable only to the contract claim. Our decision has the effect of reversing the court of appeals' actions on compensatory and punitive damages for tradename infringement and its reasons for remand, and approving the circuit court's original rulings.

¶ 5. On remand, the circuit court is to determine whether, under the purchase agreement, the Statzes are entitled to attorney fees incurred in connection with the appeal, and if entitled, then in what amount.

## I. BACKGROUND

¶ 6. In the late 1970s, Anderson began building the business that would eventually become D.L. Anderson Co. He started with sailboat rentals and soon expanded to selling and installing piers and boatlifts. By 1982 he was operating under the name D.L. Anderson Co. The business grew to offer a range of marine services and products, including marine contracting; shoreline restoration; rip rapping;[3] landscaping; and manufacture, sales and service of marine accessories, docks, piers, lifts and hoists.[4]

¶ 7. In 2000 Anderson sold the business to the Statzes for $891,000. The Asset Purchase Agreement (Agreement) stated, "The Purchased Assets being transferred by Seller to Buyer pursuant to this Agreement include, but are not limited to, equipment, tools, inventory, the trade name D.L. Anderson Co., customer lists, customer history, customer contracts, vendor lists, vendor contracts and agreements, protected territories, franchises, business telephone and fax numbers, business e-mail addresses, internet web site and addresses, and goodwill." The purchase price consisted of $400,000 for restrictions on competition,[5] $200,000 for goodwill and use of the tradename, and $291,000 for equipment and inventory.

---

[3] In testimony at the trial, "rip rapping" was described as "dumping crushed rock on the shoreline."

[4] "[M]arine contracting, shoreline restoration, rip rapping, landscaping, manufacture, sales and service of marine accessories, docks[,] piers, lifts, and hoists" are collectively referred to as "the Pier and Lift Business" in the purchase agreement later entered by Anderson and the Statzes.

[5] The Agreement's noncompetition clause provided that:

¶ 8. The Statzes formed a corporation called D.L. Anderson Lakeside Leisure Co., Inc., but operated the business under the name D.L. Anderson Co. They advertised the business as D.L. Anderson and D.L. Anderson Co. Marine Contractors.

¶ 9. Anderson told the Statzes at the time of the sale that he intended to get out of the marine contracting business and go into real estate. But beginning in 2002, he made a series of business deals that the Statzes saw as violating the Agreement.

¶ 10. In August 2002, Anderson entered an agreement with Kann Manufacturing Corporation relating to "products, technologies and marketing strategies regarding an invention relating to a work boat for boatlifts . . . ." In November 2003, Anderson was observed using the prototype of the work boat on his property. In May 2004, Anderson submitted a patent application for a "work boat for installing and removing boatlifts."[6] At trial Anderson testified that he had planned to mass-produce and sell the work boat.

¶ 11. Sometime in late 2002 or early 2003, Anderson took a job with Pier Pleasure, a Minnesota-based

---

a. [F]or a period of seven (7) years from the Closing Date [Anderson] will neither permit Anderson's name to be used by nor engage in or carry on, directly or indirectly, either for itself or as a member of a partnership, limited liability company, or as a stockholder, investor, officer or director of a corporation (other than Buyer or a subsidiary or affiliate of Buyer) or as an employee, agent, associate or consultant of any person, partnership or corporation (other than Buyer or a subsidiary or affiliate of Buyer) any business in competition with the Pier and Lift Business as carried on by Buyer.

b. The restrictive covenant in this Section 6.5 shall apply within a 120–mile radius of the City of Waunakee, Wisconsin.

[6] Anderson testified at trial that the patent application eventually expired.

manufacturer and distributor of piers and boatlifts.[7] As a factory representative for Pier Pleasure, he established three new dealerships within the region covered by the noncompetition clause, provided display and marketing support for dealerships, set and maintained sales performance levels for each dealership, obtained sales forecasts, and assisted with warranty issues and product training. His responsibilities covered a four-state area, including Wisconsin. He also received commissions on sales.

¶ 12. In 2003, Anderson formed Anderson Marine, LLC, and acquired a business known as The Sailboat House near the Statzes' business. Anderson operated the business under the name The Sailboat House at Anderson Marine, and maintained websites and phone book listings as both The Sailboat House and Anderson Marine.[8] Anderson's new business sold, stored, and repaired motorboats and sailboats, and sold marine accessories.

¶ 13. On at least one occasion in 2003, Anderson publicized his capability for doing shoreline restoration and landscape work. In November 2003, the Middleton Times-Tribune newspaper printed a photo of a brush cutter being used to cut down brush along the edge of a pond. The photo identified the operator as "Don Anderson of Anderson Marine, LLC."

¶ 14. In September 2004, the Statzes filed suit against Anderson and Anderson Marine, LLC, alleging breach of the noncompetition provisions of the pur-

---

[7] Prior to selling the business to the Statzes, Anderson sold Pier Pleasure products at D.L. Anderson Co., and the Statzes continued to sell Pier Pleasure products after they purchased the business.

[8] In 2005, after the Statzes filed suit, Anderson changed the name of his business to The Boathouse of Madison.

chase agreement, infringement of tradename, unfair competition, and breach of contract. The Statzes requested permanent injunctive relief prohibiting Anderson from competing in the pier and lift business, and from using their tradename or any similar name. They also requested compensatory damages, punitive damages, attorney fees, and costs.

¶ 15. Following a jury trial in Dane County Circuit Court in April 2006, the Honorable Shelley Gaylord presiding, a jury returned a special verdict finding that Anderson had breached the noncompetition clause and awarding $15,000 in compensatory damages. The jury also found Anderson had infringed on the D.L. Anderson tradename and awarded the Statzes $75,000 in compensatory damages. In addition, the jury awarded $160,000 in punitive damages against Anderson and $20,000 in punitive damages against Anderson Marine, LLC.

¶ 16. The Statzes then filed motions after verdict, requesting injunctive relief and also requesting extension of the restrictive covenants by 591 days, from the date on which the complaint was filed to the date the motion was filed, pursuant to the Agreement.[9] A motion requesting attorney fees and costs in the amount of $95,515.91 was also filed.

¶ 17. Anderson filed motions after verdict requesting an order to change the answers to the verdict questions, a new trial, and judgment notwithstanding the verdict.

---

[9] The Agreement contained a provision in the section on "Noncompetition" that stated:

> The term of the covenants contained in Section 6.5 shall be tolled for the period commencing on the date any successful action is filed for injunctive relief or damages arising out of a breach by Seller or Anderson of Section 6.5 and ending upon final adjudication (including appeals) of such action.

573

¶ 18. The circuit court denied Anderson's motions. The circuit court extended the restrictive covenants, granted the injunctive relief, and awarded the attorney fees requested by the Statzes.

¶ 19. Anderson appealed. As noted above, the court of appeals affirmed the verdict as to the findings of breach, damages awarded for breach, and tradename infringement; it reversed the jury's award of compensatory and punitive damages for tradename infringement; and it remanded to the circuit court for a determination of attorney fees only for the breach claim.[10] *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2007 WI App 269, 306 Wis. 2d 470, 744 N.W.2d 300.

¶ 20. The Statzes petitioned this court for review; Anderson cross-petitioned for review. Review was granted on March 18, 2008.

## II. STANDARD OF REVIEW

¶ 21. The jury found that Anderson breached the Agreement and infringed the tradename, and it awarded the Statzes damages on both claims. We start by setting forth the general standard of review governing jury verdicts. When we come to issues for which other standards of review are applicable, we will note the appropriate standard prior to addressing the issue.

¶ 22. When reviewing a jury verdict, we affirm if the record contains "any credible evidence" to support the verdict; this is "even more true when the trial court

---

[10] It also upheld the injunctive relief granted by the circuit court, slightly modifying the injunction to include the words "within 120 miles." *D.L. Anderson's Lakeside Leisure*, 306 Wis. 2d 470, ¶¶ 49–55. The injunction is not before us because Anderson no longer challenges it.

gives its explicit approval to the verdict by considering and denying postverdict motions." *Radford v. J.J.B. Enter., Ltd.*, 163 Wis. 2d 534, 543, 472 N.W.2d 790 (Ct. App. 1991). The reviewing court has a "duty to search for credible evidence to sustain the jury's verdict." *Id.* "We afford special deference to a jury determination in those situations in which the trial court approves the finding of a jury. In such cases, this court will not overturn the jury's verdict unless 'there is such a complete failure of proof that the verdict must be based on speculation.' " *Morden v. Continental AG*, 2000 WI 51, ¶ 40, 235 Wis. 2d 325, 611 N.W.2d 659 (citations omitted). A challenge to the sufficiency of the evidence is evaluated in light of the jury instructions. *Kovalic v. DEC Int'l, Inc.*, 161 Wis. 2d 863, 873 n.7, 469 N.W.2d 224 (Ct. App. 1991).

## III. THE AGREEMENT'S NONCOMPETITION CLAUSE: BREACH, DAMAGES AND EXTENSION

¶ 23. Anderson challenges the sufficiency of the evidence to support the verdict of the jury on its award of damages related to the noncompetition clause of the Agreement. We review that challenge under the standard recited above.

### A. Breach

¶ 24. On this issue, we briefly address the underlying breach. The Statzes ask us to affirm the court of appeals' holding that the evidence was sufficient to support the jury's verdict that Anderson breached the Agreement. In his brief, Anderson concedes that, given the applicable standard of review, sufficient evidence was presented to uphold that determination.

■
¶ 25. The court of appeals cited evidence the jury heard about Anderson's work establishing three competing Pier Pleasure dealers within the 120–mile radius covered by the noncompetition agreement, and said it was sufficient to support the verdict that he violated the business noncompetition clause. The court of appeals also noted evidence on which the jury could have based its noncompetition verdict as to the use of the Anderson name, citing both documents and testimony concerning marine accessories sold by The Sailboat House at Anderson Marine, the business Anderson opened one mile from the Statzes' business. We agree with the court of appeals that there was sufficient evidence to support the jury's finding that Anderson breached the Agreement in regard to noncompetition.

## B. Compensatory damages

■
¶ 26. The standard for reviewing a jury award of damages is similar to the standard for other types of jury verdicts. "If there is any credible evidence which under any reasonable view supports the jury finding as to (the amount of) damages, especially when the verdict has the approval of the trial court, this court will not disturb the finding." *Wis. Natural Gas Co. v. Ford, Bacon & Davis Constr. Corp.*, 96 Wis. 2d 314, 340, 291 N.W.2d 825 (1980)(citations omitted).

■
¶ 27. Even though breach may have been proved, Anderson argues there was insufficient evidence to support the award of $15,000 in damages for such breach. Anderson asserts, for example, that the sales data provided as to the Statzes' pier installation sales

576

did not differentiate between various pier manufacturers and, thus, could not fairly reflect any lost sales that resulted from his work as a representative for a single pier manufacturer.

¶ 28. The Statzes say the damages from the violation of the noncompetition clause included not only lost profits, but also their loss of the benefit of the bargain they made, i.e., the difference between the value of the noncompetition clause that Anderson violated and the amount they paid for it. They describe their position as analogous to that of a buyer of a defective car, who had, this court recognized, "ordinary loss of bargain damages: the difference between the actual value of the goods accepted and the value they would have had if they had been as warranted." *Mayberry v. Volkswagen of Am., Inc.*, 2005 WI 13, ¶ 23, 278 Wis. 2d 39, 692 N.W.2d 226 (quoting *Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc.*, 526 N.W.2d 305, 309 (Iowa 1995)).

¶ 29. The jury was given the standard instruction on damages in general,[11] and a slight variation of the standard instruction on contract damages.[12]

¶ 30. In its ruling denying Anderson's motions after the verdict, the circuit court noted, "[T]he bottom

[11] "[T]he burden of proof rests upon each person claiming damages to satisfy you by the greater weight of the credible evidence, to a reasonable certainty, that the person sustained damages with respect to the element or elements mentioned in the question and the amount of the damages.... Credible evidence means evidence you believe in light of reason and common sense. 'Reasonable certainty' means that you are persuaded based upon a rational consideration of the evidence. Absolute certainty is not required, but a guess is not enough to meet the burden of proof." Wis JI—Civil 1700.

[12] The instruction given to the jury varied slightly from Wis JI—Civil 3735; e.g., the standard instruction uses the word

line in this case is that some of this amounted to credibility determinations, but a lot of it was an accumulation of defendant's own testimony and some of the exhibits that bore on what he was doing with various items." The circuit court also observed, in a post-trial hearing on injunctive relief, "This is a jury that did not believe [Anderson]. It was palpable during the trial. It was clear to me they didn't believe him." The circuit court affirmed the jury's verdict on this and all points, saying, "There was more than adequate evidence put in at trial for the responses of the jury verdicts on all the questions that the defendant moved to change."

¶ 31. The court of appeals reviewed evidence presented to the jury, including the difference in the Statzes' gross receipts for new pier installation in 2002 and 2003, and Scott Statz's testimony attributing the decline to the new pier dealers established by Anderson in areas where the Statzes had previously made sales. *D.L. Anderson's Lakeside Leisure*, 306 Wis. 2d 470, ¶ 23. It also noted that the jury saw evidence of the 2003 retail sales of the new pier dealers with whom the Statzes competed. Anderson argues that "the most

"because" rather than "as a result" and defines benefit as "the net gain he or she would have realized from the contract." The jury was instructed as follows:

> The measure of damages for a breach of contract is the amount which will compensate the plaintiff for the loss suffered as a result of the breach. A party who is injured should, as far as it is possible to do by monetary award, be placed in the position in which he or she would have been had the contract been performed. The fundamental basis for an award of damages for breach of contract is just compensation for losses as a result of the breach. A party whose contract has been breached is not entitled to be placed in a better position because of the breach than the party would have been had the contract been performed. The injured party is entitled to the benefit of his or her agreement, but for the failure of the other party to perform.

likely reason for the coinciding increase in merchandise sales and the decrease in labor sales is that more purchasers were buying piers that they can self-install." That is a theory the jury was free to consider and reject. We agree with the court of appeals that sufficient evidence was presented to sustain the jury's verdict awarding the Statzes $15,000 for Anderson's breach of the Agreement in regard to noncompetition.

C. Extension of the noncompetition clause

██

¶ 32. This issue involves construction of a contract, which presents a question of law and is therefore subject to independent appellate review. *Johnson Controls, Inc. v. Employers Ins. of Wausau*, 2003 WI 108, ¶ 30, 264 Wis. 2d 60, 665 N.W.2d 257.

¶ 33. As noted previously, the Agreement contained a provision in the section on "Noncompetition" that stated,

> The term of the covenants contained in Section 6.5 shall be tolled for the period commencing on the date any successful action is filed for injunctive relief or damages arising out of a breach by Seller or Anderson of Section 6.5 and ending upon final adjudication (including appeals) of such action.

¶ 34. The analysis of the court of appeals on this point is concise and complete:

> Based on the jury's findings of a breach of the noncompete clause and damages, the court extended the noncompete clause by 678 days. The defendants object to this order on the ground that Anderson did not breach the noncompete but raise no other objection. Because

we have concluded there was sufficient evidence for the jury to find both a breach of that clause and to award $15,000 in damages, we conclude the court's extension was proper.

*D.L. Anderson's Lakeside Leisure,* 306 Wis. 2d 470, ¶ 29.

¶ 35. We agree with the court of appeals that the noncompetition clause was properly extended.

## IV. THE TRADENAME INFRINGEMENT CLAIM

¶ 36. The jury unanimously found that Anderson had infringed the tradename. As noted above, the circuit court denied Anderson's motion to change that answer.

¶ 37. There is a preliminary question on this issue as to whether we review this question de novo or with deference to the jury's verdict. Anderson argued in the court of appeals that there was insufficient evidence to support the finding of the tradename infringement. The court of appeals, noting that a challenge to the sufficiency of the evidence is evaluated in light of the jury instructions, first looked at the instructions given and then looked at the evidence. The court of appeals construed Anderson's corollary arguments—that the contract's noncompetition clause governed the limits of the tradename sale and that Anderson's use of his own name could not constitute tradename infringement—as a challenge to the jury instructions. Given that Anderson neither directly challenged the jury instructions on appeal nor cited to any objection in the record against them, the court of appeals deemed that argument waived and disregarded it. *D.L. Anderson's Lakeside Leisure,* 306 Wis. 2d 470, ¶ 33.

¶ 38. Anderson vigorously denies having waived his opportunity to challenge the jury instructions. At

580

oral argument before this court, Anderson's counsel called the tradename infringement instruction "clearly the wrong jury instruction."

¶ 39. A few principles guide us when a challenge is made to jury instructions. Whether a jury instruction is appropriate is a legal issue subject to independent review. *Root v. Saul*, 2006 WI App 106, ¶ 13, 293 Wis. 2d 364, 718 N.W.2d 197. A circuit court has broad discretion in instructing a jury but must exercise that discretion in order to fully and fairly inform the jury of the applicable rules of law. *State v. Coleman*, 206 Wis. 2d 199, 212, 556 N.W.2d 701 (1996). "Only if the jury instructions, as a whole, misled the jury or communicated an incorrect statement of law will we reverse and order a new trial." *State v. Laxton*, 2002 WI 82, ¶ 29, 254 Wis. 2d 185, 647 N.W.2d 784 (citation omitted). Counsel's failure to object at the jury instruction and verdict conference constitutes a waiver of any error in the proposed instructions or verdict. *See* Wis. Stat. § 805.13(3) (2005–06).[13] However, this court may, in its discretion, review waived issues. *Vollmer v. Luety*, 156 Wis. 2d 1, 11, 456 N.W.2d 797 (1990); *Clark v. Leisure Vehicles, Inc.*, 96 Wis. 2d 607, 617, 292 N.W.2d 630 (1980).

---

[13] "Instruction and verdict conference. . . . The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict." Wis. Stat. § 805.13(3).

All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

¶ 40. It is clear that, in the circuit court, Anderson's counsel repeatedly objected to treating this action as a tradename infringement claim on the grounds that the language in the noncompetition clause essentially qualified the transfer of the tradename. We note, however, that a tradename instruction was one of three non-standard instructions included in the "Defendant's Proposed Jury Instructions." Anderson's proposed instruction closely tracked the jury instruction eventually given, including sections on secondary meaning, likelihood of confusion, and, most relevantly, language about an infringement action being appropriate against a non-competitor and language about conveying by contract a party's family name as part of a tradename. For example, Anderson's proposed jury instruction included the following language that was in the final instructions given by the circuit court:

> Ordinarily a party has a right to do business under his or her own name. The right may, however, be voluntarily limited by contract. When a family name is part of a trade name, the family name may be transferred to the purchaser the same as any other asset of the business. . . . Infringement actions, even against a noncompetitor, protect the reputation and goodwill exclusively appropriated to the trademark holder.

 

¶ 41. While the court of appeals was correct that the issue was waived since explicit objection was not made at the instructions conference as required by Wis. Stat. § 805.13(3),[14] we will nevertheless address the

---

[14] Both parties submitted jury instructions as to tradename infringement. During the jury instructions conference, the court and counsel for the two parties methodically worked through the exact wording of each of the instructions, including the proposed tradename instruction. The transcript of the con-

question. In this case, we exercise our discretion to review the waived challenge to the jury instructions because that challenge involves important issues that we wish to address.

¶ 42. The tradename infringement jury instructions given by the circuit court were based directly on language in Wisconsin case law.[15] In *First Wisconsin National Bank of Milwaukee v. Wichman*, 85 Wis. 2d 54, 270 N.W.2d 168 (1978), this court adopted the approach enunciated in the Restatement (Second) of Torts §§ 715, 716, 717 (Tentative Draft No. 8, 1963). There this court said, "[T]he user of [a] tradename is entitled to protection against infringement of that tradename." *Wichman*, 85 Wis. 2d at 62–63. *Spheeris Sporting Goods, Inc. v. Spheeris on Capitol*, 157 Wis. 2d 298, 459 N.W.2d 581 (Ct. App. 1990), which like this case dealt with a tradename in connection with the purchase of a business, appears to be the source of the sections in the jury instructions on tradenames that include family names: "Ordinarily, a party has a right to do business

ference runs 78 pages. Earlier in the day, the court had asked counsel to review together their own submitted instructions: "At a minimum, it seems the Tradename and Unfair Competition you agree on. . . . And I also think if you read your Damages ones, I'm not sure they're that terribly far apart, so see what you can merge and then what you can't." When the jury instructions conference began, the court said, "We're going to start with areas of disagreement with the tradename proposal. Did you come close? Any closer?" The record reflects no objection by Anderson either at the end of the discussion of the tradename instruction or at the end of the jury instruction conference.

[15] There is no Wisconsin standard jury instruction for tradename infringement. Perhaps the Civil Jury Instructions Committee might consider an instruction on this matter as well as one on the matter of damages for tradename infringement.

under his or her own name. The right may, however, be voluntarily limited by contract. . . . [W]hen a family name is part of a trade name, the family name may be transferred to the purchaser the same as any other asset of the business." *Id.* at 308 (citations omitted).

¶ 43. Anderson disputes that the instruction given, even if accurate, is the "applicable rule of law" in this case. Like the circuit court and the court of appeals, we disagree.

¶ 44. Anderson contends that when the Agreement's clauses are read together, the noncompetition clause restricted the tradename rights the Statzes purchased; thus, any action against Anderson must be controlled by contract law, not tort law. The Statzes point to the language of the Agreement concerning the Purchased Assets, one of which is "the tradename D.L. Anderson Co.": "Seller has, and Buyer is receiving, good and marketable title to the Purchased Assets, free and clear of all . . . covenants, reservations, restrictions or encumbrances of any nature whatsoever, except as otherwise contemplated herein. None of the Purchased Assets is subject to any restrictions with respect to the transferability thereof." The Statzes argue that the tradename conveyance established an absolute right to the tradename. The noncompetition clause prohibited other commercial use of Anderson's name *not* covered by tradename protections, e.g., Anderson's commercial use of his name to advertise affiliation with a competing business, and the limitations on that clause (seven years, a 120–mile radius, applicable only to businesses in competition with the Statzes) have nothing to do with the transfer of the tradename.

¶ 45. The question of how to analyze tradenames conveyed by contract was answered by the *Spheeris* court. "Although [the tradename purchaser's] right to

use 'Spheeris' was granted in the 1979 agreement, we do not look only to the agreement for controlling law. Because it is a corporate name, 'Spheeris Sporting Goods' is a trade name, entitled to protection against unfair competition." *Spheeris*, 157 Wis. 2d at 307 (citation omitted).

¶ 46. We believe *Spheeris* controls here. There is no indication in the contract that the sale of the tradename was restricted or limited. It is not reasonable to read the noncompetition clause language as Anderson asks; to do so would mean that the expiration of the noncompetition clause after seven years would render the tradename purchase meaningless.

¶ 47. The *Spheeris* court correctly stated the law. The tradename infringement claim arises under the contract only in the sense that the contract is the instrument by which the tradename was purchased. A separate tort may be perpetrated once the tradename belongs to the purchaser, just as a separate tort would exist for tortious conversion if Anderson had interfered with the Statzes' right to the heavy equipment, vehicles, and other tangible property that the Agreement also transferred to them. The fact that a contract underlies the transfer of property does not limit all subsequent claims concerning the property to contract claims. Anderson would read the noncompetition clause as diluting the Statzes' tradename rights, but the noncompetition clause actually supports the protection the Agreement affords them because it prohibits *additional* commercial use of Anderson's name. As legal authorities have noted:

> [W]hile a person may sell the right to commercial use of his personal name, a court will not bar the seller from all commercial use of the name unless the intention to convey an exclusive right is clear in the contract of the sale. Unless the contract provides otherwise, a person is

585

not precluded after the sale from taking advantage of his individual personal reputation (vis-à–vis the reputation of the business that bore his name) in advertising a competing product.

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:33 (4th ed. 2008).

¶ 48. Here, "the intention to convey an exclusive right is clear in the contract" in more than one place. In addition, while Anderson would not ordinarily be "precluded after the sale from taking advantage of his individual reputation," the noncompetition clause is the part of the contract that provides otherwise and limits Anderson's other commercial use of his name under its specific terms.[16]

¶ 49. We are satisfied that the tradename infringement instruction was appropriate, based on the *Spheeris* case and the language of the Agreement discussed herein.

A. Secondary meaning and likelihood of confusion

¶ 50. Next we proceed to the question of whether the evidence was sufficient to support the jury's verdict. The jury was instructed as follows regarding tradename infringement:

---

[16] Anderson cites to 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:33 (4th ed. 2007), for the proposition that "[w]hile the buyer of a business obtains the right to the seller's name as a mark, the seller can continue such usage also, unless there is express language in the contract giving the buyer the *exclusive right* to use the personal name as a mark." He omits the introductory words to that sentence: "Some courts imply that . . . ." The cases that imply that, according to the treatise, are cases from Texas, Illinois, and New Jersey decided in 1968, 1959 and 1918, respectively.

When a tradename has acquired a secondary meaning, the name is entitled to protection from unfair competition based on tradename infringement. . . . If you find that Plaintiff's tradename has acquired secondary meaning, you must then determine whether there is a likelihood of confusion between Plaintiff's tradename, "D.L. Anderson Co." and Defendant's name, "Anderson Marine". . . . It is not necessary to constitute an infringement that every word of the tradename be appropriated. It is sufficient that enough be taken to deceive the public. If one word of the tradename is the salient portion, it may be given greater weight than surrounding words.

¶ 51. The jury instructions thus lay out the two elements a plaintiff must establish to prevail on a tradename infringement claim: that the name had secondary meaning and that a second party's use created a likelihood of confusion.

■■

¶ 52. Secondary meaning "describes the function of identifying goods or services with a particular or single source. . . . Key to establishing secondary meaning for a trade name is evidence that the relevant target group mentally identifies the trade name as the single source for the product." *Spheeris*, 157 Wis. 2d at 312 (citations omitted).

¶ 53. As the court of appeals pointed out, the evidence shows that the Statzes paid Anderson a substantial fee for the name; D.L. Anderson Co. had been in business for approximately 20 years; there was evidence of extensive advertising; and Anderson testified that in 2000 he had between 300 and 500 "regular customers." *D.L. Anderson's Lakeside Leisure*, 306 Wis. 2d 470, ¶ 36. In his brief, Anderson conceded that the tradename had acquired a secondary meaning.

587

¶ 54. We next turn to the evidence for the second element, likelihood of confusion. The jury was given a list of factors to consider when determining likelihood of confusion.[17] Anderson contends that the question of likelihood of confusion cannot apply where there is no competing business, another argument rooted in the view of this case as a contract case, not a tradename infringement case. He argues, therefore, that the Statzes cannot show likelihood of confusion. The Statzes argue that there was evidence not only of likelihood of confusion but also of actual confusion.

¶ 55. The court of appeals listed the evidence of the likelihood of confusion: the similarity of "D.L. Anderson Co." and "Anderson Marine, LLC"; essentially the same target market; similar marketing plans; and the proximity of the two businesses. *Id.*, ¶ 38. There was evidence of actual confusion as well, including phone calls, mail, and deliveries intended for one business that went to the other.

¶ 56. The jury instructions accurately state Wisconsin law on tradename infringement. We agree with the court of appeals that from the evidence presented a jury could reasonably conclude that the name "D.L.

---

[17] The jury was instructed that:

Likelihood of confusion is also determined by evaluating the following factors: The degree of similarity between the names, the similarity of the products and overlap of marketing channels, area and manner of concurrent use, the degree of care likely to be exercised by consumers, the strength and distinctiveness of plaintiff's—it's name, not mark, evidence of actual confusion, and defendants' intent when selecting the name "Anderson Marine."

No one factor or consideration is conclusive, but each aspect should be weighed in light of the total evidence at the trial. However, while actual confusion or deception is not essential to a finding of tradename infringement and unfair competition, such evidence is entitled to substantial weight.

Anderson Co." had acquired secondary meaning, and that "Anderson Marine" created a likelihood of confusion with the name "D.L. Anderson Co." We agree with the court of appeals that sufficient evidence existed to support the jury's verdict that Anderson infringed the tradename.

## B. Compensatory damages

¶ 57. As noted previously, we evaluate the challenge to the award of compensatory damages in terms of whether there was any credible evidence to support the award and whether the award was within reasonable limits.

¶ 58. "Under our judicial system, we rely primarily upon the good sense of jurors to determine the amount of money which will compensate an individual for whatever loss of well-being he has suffered as a result of injury." *Olson v. Siordia*, 25 Wis. 2d 274, 283, 130 N.W.2d 827 (1964) (quoting *Makowski v. Ehlenbach*, 11 Wis. 2d 38, 41–43, 103 N.W.2d 907 (1960)). "It is not [the reviewing court's] purpose to determine whether damage awards are high or low, nor to substitute [its] judgment for that of the jury or the trial court but rather to determine whether the award is within reasonable limits." *Id*. at 286.

¶ 59. Wisconsin Stat. § 805.14(1) provides:

No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the

> party against whom the motion is made, there is no credible evidence to sustain a verdict in favor of such a party.

This standard is used both by the circuit court and the appellate court. *Weiss v. United Fire and Cas. Co.*, 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995). "Because a circuit court is better positioned to decide the weight and relevancy of the testimony, an appellate court 'must also give substantial deference to the trial court's better ability to assess the evidence.' " *Id.* at 388–89 (citing *James v. Heintz*, 165 Wis. 2d 572, 577, 478 N.W.2d 31 (Ct. App. 1991)).

¶ 60. Anderson argues that: (1) the Statzes failed to present any evidence that there was a diminution of the goodwill attributable to the alleged tradename infringement; (2) confusion as to the tradename is insufficient to establish injury; and (3) the $200,000 purchase price of the goodwill cannot be the basis for any calculation of damages because it is imprecise and because tax considerations affect the price allocated to goodwill in asset sales.

¶ 61. The Statzes counter that when they paid $200,000 for goodwill, and that goodwill was damaged by infringement, they were entitled to a compensatory damage award up to the full purchase price. That the jury awarded something less than that, they argue, is a rational approach because it recognizes that the value of the goodwill was diminished by the infringement.

¶ 62. As we noted, the jury was instructed here that the party claiming damages must "satisfy [the jury] by the greater weight of the credible evidence, to a reasonable certainty, that the person sustained damages . . . and the amount of the damages." Wis JI—Civil 1700.

¶ 63. In evaluating the sufficiency of the evidence on a damage award in tort, there is thus a two-step analysis: the fact of damages and the amount.

¶ 64. "[T]he fact of damage need only be proved with reasonable, not absolute, certainty. And once the fact of damage is established with reasonable certainty, the amount of damages need only be shown with as much certainty as the nature of the tort and the circumstances of the case permit." 4 Rudolf Callmann, *Callmann on Unfair Competition, Trademarks and Monopolies* § 23:55 (4th ed. 2003).

¶ 65. This is consistent with Wisconsin case law on damages where "the nature of the tort and the circumstances of the case" make precise determinations of damages impossible.

> [T]here is no absolute requirement of mathematical precision, and the fact that the full extent of the damages is a matter of uncertainty by reason of the nature of the tort is not a ground for refusing damages. It is generally held that the uncertainty which prevents recovery is uncertainty as to the fact of the damage and not to its amount. This rule is applied where, from the nature of the case, the extent of injury and the amount of damage are not capable of exact and accurate proof.

*Eden Stone Co. v. Oakfield Stone Co.*, 166 Wis. 2d 105, 125, 479 N.W.2d 557 (Ct. App. 1991) (citations omitted).

¶ 66. The court of appeals found the absence of testimony of customers who had a negative view of the Statzes' company resulting from confusion fatal to the claim of damages based on diminution of goodwill. *D.L. Anderson's Lakeside Leisure*, 306 Wis. 2d 470, ¶ 43. However, that requirement is too narrow to square with

the principle set forth in *Eden Stone*. The court of appeals acknowledged that there might be other bases for damages but did not believe that any were established by the evidence. *Id.*, ¶ 45. We disagree.

¶ 67. The value of the goodwill to the Statzes is readily established, as a preliminary matter, by the $200,000 purchase price negotiated by the parties. Further, there was testimony from the Statzes as to the value of the goodwill *after* the infringement. Steven Statz testified that: "We purchased the name knowing that it was a very valuable asset. . . . If I thought there was a chance they were going to confuse us with him at another location, I certainly wouldn't have paid as much for it." Testifying about the value of the tradename and the noncompetition clause, Scott Statz said, "The value of the business was in the name, its reputation . . . . No, I would not have offered any money. The business would have no value." "Wisconsin case law is clear that an owner of property may testify as to its value and that such testimony may properly support a jury verdict for damages, even though the opinion is not corroborated or based on independent factual data." *Mayberry*, 278 Wis. 2d 39, ¶ 42.

¶ 68. As the circuit court noted, the jury made credibility determinations, which are within the province of the jury. The jury could reasonably have credited the Statzes' testimony concerning the diminution of value of the goodwill, which was their property.

¶ 69. Further, there was testimony about customer frustration concerning mixed up invoicing. For example, Sue Statz testified that one customer had confused the two businesses and paid an invoice due to the Statzes by sending a check to Anderson Marine, LLC. She testified about what happened next:

> I sent him an invoice and that remained unpaid. Then I sent him another invoice for something else. He paid that one so I sent him a statement saying you still owe for this past invoice[,] and then he called me, and he was not happy, to say that he had paid it. I could not find anything in the computer so I had to get back to him. Then I finally did, and I said I'm sorry, I still don't see your payment and he was not happy. I said couldn't you just send me a copy of the check so that I could get this cleared up and then he did, and I believe that's the copy he sent.

When she received the copy of the check, she saw that it had been made out to and cashed by Anderson Marine.

¶ 70. Here the jury was given the standard instruction on damages in general, which says in part, "[c]redible evidence means evidence you believe in light of reason and common sense." The jury was instructed concerning the compensatory damages on tradename infringement that "[t]he goodwill of a company is an intangible business value that reflects the basic human tendency to do business with merchants who offer products and services of the type and quality the customer desires and expects."

¶ 71. Having heard testimony from Sue Statz about uncomfortable interactions with customers and confusion relating to payment of invoices, the jury was entitled to rely on the common experience that people who have had to sort out billing errors, especially when they have rightfully paid the invoice, do not generally feel a sense of goodwill toward the business that has accused them of not paying. The jury could further reasonably have inferred from the testimony about such customer frustration that there was indeed a diminution in the value of the goodwill purchased for $200,000.

¶ 72. But even beyond those real but difficult to quantify losses, there was evidence of other, more tangible losses as well. Sue Statz's testimony mentioned repeated billing mixups caused by customers' and vendors' confusion about the two companies; as office manager she had to devote time to straightening these errors out. Scott Statz testified that on multiple occasions, he incurred labor costs due to mistaken deliveries intended for Anderson's company. He gave the example of a semi truck arriving at his company with a load of product, and having his employee leave the work he was doing to unload the truck with a forklift. Only after he had emptied the truck and the driver had left did the employee discover that the entire contents would have to be reloaded and arrangements would have to be made to get it delivered to Anderson Marine, the intended recipient. Scott Statz also testified that there were times when parts intended for their business were mistakenly delivered to Anderson Marine, and the delays in getting the needed parts cost unnecessary downtime and "considerable expense" to the business. Certainly jurors familiar with everyday costs incurred by a business to reroute deliveries, track down wrongly delivered parts, and pay labor costs for unproductive time could have found evidence in the testimony to support an award of compensatory damages.

¶ 73. It is true that there is not a mathematical precision to the determination of the damages here, but in cases like this, we do not hold plaintiffs to that standard.

¶ 74. The question presented here requires us to apply two standards together: the acknowledgement that where the damages are uncertain "by reason of the nature of the tort" they will not be refused, combined with the deference to the jury award of damages where

there is any credible evidence to sustain such award. That combination requires us to uphold the jury's compensatory damage award. Given a "within reasonable limits" standard of review, we find that the jury could reasonably have awarded $75,000, which was well within the $200,000 the Statzes and Anderson established as the purchase price of the goodwill of the business.

## C. Punitive damages

■

¶ 75. The court of appeals' ruling on compensatory damages had the effect of reversing the award of punitive damages as well. Because we approve the compensatory damages award, we must consider the jury's award of punitive damages.

¶ 76. The United States Supreme Court has held that:

> Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. Most States that authorize exemplary damages afford the jury similar latitude, requiring only that the damages awarded be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence.

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) (citations omitted).

■

¶ 77. Wisconsin law permits an award of punitive damages "if evidence is submitted showing that the

defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3). The law "requires a plaintiff to show that a defendant acted maliciously toward the plaintiff or intentionally disregarded the rights of the plaintiff, not that a defendant intended to cause harm or injury to the plaintiff." *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶ 61, 279 Wis. 2d 4, 694 N.W.2d 320.

■■■

¶ 78. This court has shown deference to jury awards of punitive damages. "According to Wisconsin law, the award of punitive damages in a particular case is within the discretion of the jury, and '[w]e are reluctant to set aside an award merely because it is large or we would have awarded less.' " *Trinity Evangelical Lutheran Church and School-Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 46, 261 Wis. 2d 333, 661 N.W.2d 789 (quoting *Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 626, 563 N.W.2d 154 (1997)).

¶ 79. However, when the punitive damages are challenged as excessive, this court has said,

> [A] de novo standard of review is appropriate when reviewing a circuit court's determination of the constitutionality of punitive damages awards.

> Although de novo review is the appropriate standard of review, we nevertheless acknowledge that the Due Process Clause of the Fourteenth Amendment imposes substantive limits on the size of a punitive damages award.

> An award is excessive, and therefore violates due process, if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing.

*Trinity Evangelical*, 261 Wis. 2d 333, ¶¶ 48–50 (citations omitted).

¶ 80. The rules we apply in making that determination are "those factors which are most relevant to the case" from a list of factors considered by Wisconsin courts in prior cases:

> 1. The grievousness of the acts; 2. The degree of malicious intent; 3. Whether the award bears a reasonable relationship to the award of compensatory damages; 4. The potential damage that might have been caused by the acts; 5. The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and 6. The wealth of the wrongdoer.

*Id.*, ¶ 53 (citations omitted).

¶ 81. Anderson argues that there is no evidence of the required maliciousness or intentional disregard of rights and that the award is excessive. He also argues that such an award is improper because there was no explicit assessment of his ability to pay such an award.

¶ 82. The Statzes argue that credible evidence shows that Anderson deliberately used an infringing name and that public policy supports punitive damages to deter unlawful infringement. They counter Anderson's last point with evidence in the record of Anderson's real estate holdings and the price they paid for the business itself—$891,000.

¶ 83. Here the factors most relevant to the case are the intent to disregard the rights of the Statzes and the award's relationship to the compensatory damages.

¶ 84. Anderson's own testimony was that he chose to use the name Anderson Marine, LLC, because he knew it would be familiar to his potential customers. He was asked in a deposition, "So when you started a

different business, you knew that by signing your name to it, it would breed some familiarity with customers or former customers?" And he answered, "Correct." That deposition testimony was referred to during Anderson's testimony at trial, and Anderson again agreed.[18]

¶ 85. There was evidence from which the jury could have found, as they did find unanimously, that Anderson "act[ed] in an intentional disregard of the rights of [the Statzes]."

¶ 86. The court in the best position to judge the intent of the tortfeasor is the circuit court. There is evidence in the record that, based on the trial testimony, the circuit court found Anderson's conduct totally unacceptable. At a post-verdict motion hearing, the circuit court denied one request by the Statzes but then stated to Anderson:

> [Y]ou've got a world of hurt coming at you, sir. He's going to win on everything he requested with respect to everything else. I don't know what it's going to take to stop, but every time there's a line drawn, you seem to go right up to it and over it. . . . I'm basing it on the trial record. I'm not sure I can put in language [in the injunction] that adequately expresses what needs to stop here.

¶ 87. In *Trinity Evangelical*, this court upheld a punitive damage award that had a 7:1 ratio to the compensatory damages. *Trinity Evangelical*, 261 Wis. 2d 333, ¶ 65. Here the award of punitive damages totaled $180,000, twice the total compensatory dam-

---

[18] Q: "And when you started Anderson Marine, you knew that by naming it Anderson Marine that your former customers would be familiar with that name and would associate you with Anderson Marine?" A: "They would associate me, yes."

ages awarded on both the contract claim ($15,000) and the tradename infringement claim ($75,000).

¶ 88. In light of the forceful endorsement of the jury verdict by the circuit court in this case, we cannot say that where a unanimous jury verdict finds intentional disregard of the injured parties' rights, punitive damages that are two times the compensatory damages are excessive.

## V. INJUNCTIVE RELIEF

¶ 89. Two clauses of the Agreement guaranteed the Statzes injunctive relief if Anderson breached the contract. In his brief to this court, Anderson abandoned any challenge to the injunction.

## VI. AWARD OF ATTORNEY FEES

¶ 90. As we noted earlier, construing the terms of a contract is a "matter[] of law, subject to . . . independent review" by an appellate court. *Kasten v. Doral Dental USA, LLC,* 2007 WI 76, ¶ 19, 301 Wis. 2d 598, 733 N.W.2d 300.

¶ 91. The Agreement, as it relates to attorney fees, states as follows:

> This Agreement shall be given the broadest, lawful and enforceable scope permissible for the protection of the parties. . . . In any action concerning this Agreement, the party obtaining the monetary judgment, after all offsets, shall also be entitled to recover reasonable attorneys fees and costs. The remedies mentioned herein shall be cumulative and in addition to any other remedies which the non-breaching party may have at law or in equity.

599

¶ 92. Following the verdict, the circuit court granted the Statzes' motion for reasonable attorney fees under the terms of the contract.

¶ 93. The court of appeals examined the contract's language about "the party obtaining the monetary judgment . . . [being] entitled to recover reasonable attorneys fees and costs." The court of appeals noted that under *Hunzinger Construction Co. v. Granite Resources Corp.*, 196 Wis. 2d 327, 340, 538 N.W.2d 804 (Ct. App. 1995), parties are entitled to attorney fees under contract only where the language "clearly and unambiguously so provides." *D.L. Anderson's Lakeside Leisure*, 306 Wis. 2d 470, ¶ 66. As noted above, the court of appeals reversed the monetary judgment on the tradename infringement claim and, therefore, could not find that the Agreement's language "clearly and unambiguously" provided for an award of attorney fees attributable to claims for which monetary damages were not awarded. *Id.* The court thus remanded the matter to the circuit court for the purpose of reducing the attorney fees award. *Id.*, 67.

¶ 94. Since we are reversing the court of appeals on the monetary judgment for the tradename infringement claim, it makes little sense to deny recovery of the attorney fees awarded by the circuit court.

¶ 95. Anderson argues that attorney fees must be limited because the Agreement's language concerning entitlement to attorney fees applies in "any action concerning this Agreement," a limitation that excludes non-contract claims such as the tradename infringement claim. We are not persuaded.

¶ 96. First, the provision in question begins by stating that it is to be "given the broadest, lawful and enforceable scope permissible for the protection of the parties."

¶ 97. Second, other provisions in the Agreement clearly contemplate that "[t]he remedies . . . shall be cumulative. . . ."

¶ 98. Third, in light of the language about "any other remedies [available] . . . at law or in equity," we read the phrase "non-breaching party" as referring to the party not at fault. In this context, we do not read "non-breaching party" to limit recovery to contract actions.

¶ 99. Finally, the tradename infringement claim is clearly in the category of "any action concerning this Agreement" because the Agreement was the instrument by which ownership of the tradename in question was transferred.

¶ 100. Our conclusion is consistent with the analysis of the *Radford* court, which faced a similar claim by defendants who objected to the award of the entire amount of attorney fees. There, unlike in this case, the jury had rejected some of plaintiffs' arguments; even so, the court held:

> We hold that the entire amount of the plaintiffs' attorney's fees was properly assessed against the defendants. Under federal law, the losing party is not entitled to a reduction in attorney's fees for time spent on unsuccessful claims, if the winning party achieved substantial success and the unsuccessful claims were brought and pursued in good faith. This rule is particularly applicable where, as here, all of the plaintiffs' claims arise out of a common core of facts.

*Radford*, 163 Wis. 2d at 550 (citations omitted).

¶ 101. Giving the terms of the Agreement the "broadest, lawful and enforceable scope permissible," we view the Agreement as one intended to procure and protect the right to the tradename, and we are satisfied

that the tradename infringement claim fits within the category of "any other remedies which the non-breaching party may have at law or in equity" and within the category of "any action concerning this Agreement." Therefore, we hold that awarding the entire amount of the fees and costs pursuant to the Agreement is appropriate.

¶ 102. Of course, appeals cost money, too, and the Statzes have continued to incur attorney fees and costs in defending the circuit court judgment on appeal. They, therefore, ask this court to sustain the award of attorney fees and costs, order that it include fees and costs incurred on appeal, and remand for a determination of the additional reasonable attorney fees and costs incurred on appeal. In support of this, they cite *Chase Lumber and Fuel Co. v. Chase*, 228 Wis. 2d 179, 186, 596 N.W.2d 840 (Ct. App. 1999), generally for the proposition that "[a] [c]ompany is entitled to additional attorney fees for defending . . . appeal of the trial court's award of attorney fees."

¶ 103. The Statzes raised the same issue in their brief to the court of appeals. Anderson did not address this argument in the response briefs, either in the court of appeals or before this court. The court of appeals did not address the question either, perhaps because the resolution of other questions made it unnecessary to reach this issue. On this record, we are not in a position to resolve this issue.

¶ 104. For one thing, the holding in *Chase Lumber* is narrower than the Statzes imply. The court of appeals there held only that where a circuit court awards attorney fees as a result of frivolous action, the prevailing party is entitled to attorney fees if it is forced to defend that award on appeal. *Chase Lumber*, 228

602

Wis. 2d at 213 ("[W]e conclude that the Company is entitled to a further award of attorney fees under § 814.025 for its defense of the trial court's 'Order Awarding Attorney's Fees.'"). Unlike *Chase Lumber*, this case involves attorney fees and costs awarded under an agreement, not as a result of a frivolous action. There is nothing in the record on which we can base a determination of whether the Agreement's language concerning attorney fees necessarily contemplated attorney fees on appeal. Under such circumstances, the circuit court is the proper court to take evidence in order to make that determination. We, therefore, remand for the circuit court to decide whether, under the Agreement, the Statzes are entitled to reasonable attorney fees incurred on appeal in defending the verdict of the jury and the circuit court's decisions, and the amount of such fees and costs.

## VII. CONCLUSION

¶ 105. For the reasons set forth above, we affirm in part and reverse in part the decision of the court of appeals. We agree with the court of appeals that there was sufficient evidence for the verdict that Anderson breached the Asset Purchase Agreement's noncompetition clause, and for the award of compensatory damages on that claim. We agree, too, that once the jury found breach, the circuit court properly extended the duration of the noncompetition clause in accordance with the purchase agreement. We also agree with the court of appeals that there was sufficient evidence on which the jury could find that Anderson infringed on the Statzes' tradename.

¶ 106. However, we disagree with the decision of the court of appeals holding that there was insufficient evidence to support compensatory and punitive dam-

ages on the tradename infringement claim. We are satisfied that the evidence is sufficient to support the compensatory and punitive damage awards, and we reverse the decision of the court of appeals in regard to those matters. We also reverse the court of appeals' decision to limit the attorney fees award to those attributable only to the contract claim. Our decision has the effect of reversing the court of appeals' actions on compensatory and punitive damages for tradename infringement and its reasons for remand, and approving the circuit court's original rulings.

¶ 107. On remand, the circuit court is to determine whether, under the purchase agreement, the Statzes are entitled to attorney fees incurred in connection with the appeal, and if entitled, then in what amount.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and the cause is remanded to the circuit court.