The Selmer Company, Petitioner-Respondent,

v.

Timothy Rinn and Ganther Construction, Inc.,
Respondents-Appellants.†

Court of Appeals

*No. 2009AP1353. Submitted on briefs June 8, 2010.
—Decided July 13, 2010.*

2010 WI App 106

(Also reported in 789 N.W.2d 621.)

† Petition for Review Filed.

263

265

266

On behalf of the respondents-appellants, the cause was submitted on the briefs of *Charles J. Hertel* and *Daniel J. Posanski* of *Dempsey, Williamson, Kelly & Hertel, LLP*, Oshkosh.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *William E. McCardell, Mindy J. Rowland* and *Sara E. Spiering* of *DeWitt Ross & Stevens S.C.*, Madison.

Before Hoover, P.J, Peterson and Brunner, JJ.

¶ 1. BRUNNER, J.   Timothy Rinn and Ganther Construction, Inc. (Ganther), appeal from a judgment awarding The Selmer Company damages for breach of a covenant not to compete contained in a stock option agreement Rinn signed while employed with Selmer. Rinn and Ganther argue:   (1) the covenant is an unreasonable trade restraint and invalid under Wis. Stat. § 103.465; (2) Selmer failed to prove its damages by a reasonable certainty and with credible evidence; (3) the circuit court erred when finding Rinn in contempt for violating a preliminary injunction because the injunction's scope exceeded that of the restrictive covenant; and (4) the circuit court erred in dismissing Rinn's counterclaim for unpaid commissions as a sanction for discovery abuses.[1]

¶ 2.   We conclude the agreement's restrictive covenant is not subject to the exacting scrutiny demanded by Wis. Stat. § 103.465, but must instead be evaluated according to the common law's rule of reason. We

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

further determine the covenant is a reasonable restriction necessary for Selmer's protection and is not unnecessarily oppressive or injurious to the public. We also conclude the circuit court's damage findings are supported by sufficient evidence, and the circuit court properly exercised its discretion when crafting injunctive relief and sanctioning Rinn. Accordingly, we affirm.

## BACKGROUND

¶ 3.    Selmer is a full-service contractor, construction manager, design-builder and industrial services firm. Rinn began working for Selmer as a salesperson, but was soon promoted to director of business development. Between 1997 and 2007, Rinn was employed as Selmer's vice president of sales and marketing. Rinn served as the liaison between Selmer and its customers, with whom he developed close relationships. In this role, Rinn was the "face" of the company.

¶ 4.    During Rinn's employment, Selmer gave key employees the opportunity to purchase stock in Selmer's parent company, A.F. International, at a reduced price. Rinn was among the employees to whom Selmer offered stock options. The stock option agreement included the following nonsolicitation and confidentiality provisions:

> (a) The Employee agrees that he/she shall not, at any time during [employment with the Company and for one year following termination,] directly or indirectly, as proprietor, officer, employee, partner, stockholder, consultant, owner, or otherwise:
>
> > (i) Contact, solicit, divert, or attempt to divert, any business from the Company or contact, solicit or entice, or attempt to contact, solicit or entice, any past, present, or future Customer of the Company or

any person with whom the Company is conducting negotiations, or to whom the Company has submitted a bid so as to cause, or attempt to cause, any of said Customers or persons not to do business with the Company or to purchase products or services sold by the Company from any source other than the Company . . . .

(d) *Nondisclosure of Confidential Information.* Employee shall not at any time disclose any Confidential Information to anyone [except as required in the ordinary course of the Company's business].[2]

Rinn signed the agreement on February 17, 2000, and in December of that year purchased eight shares of A.F. International stock for $3,287.76. Rinn was not forced to accept the offer, and his refusal would not have affected his employment in any way.

¶ 5.   On August 29, 2007, Rinn notified Selmer he was ending his employment. Prior to his departure in mid-September, Rinn provided a list of "Hot Prospects," which represented those projects most likely to occur. Rinn also initiated employment negotiations with Ganther, another full-service contractor. Ganther offered Rinn a job as its director of business development on September 11, 2007. Rinn accepted and began work on October 1. He sold his A.F. International shares in December of 2007 for $13,761.33.

¶ 6.   In his first month working for Ganther, Rinn sent at least a dozen letters and made several telephone

---

[2] As pertinent here, the agreement defines "Confidential Information" as "all information concerning the pricing policies of the Company, the prices charged by the Company to its customers, the volume of orders of such customers and all other information concerning the transactions of the Company with its current or proposed customers" and "all information concerning the marketing programs or strategies of the Company."

calls to Selmer's former and prospective customers. Rinn told each he had left Selmer and was working with Ganther. He remained on the boards of directors of Selmer customers, including the Children's Museum and Meyer Theater in Green Bay. Some Selmer customers, including the Children's Museum, withdrew projects from Selmer and awarded them to Ganther. Before hiring Rinn, Ganther did little business in the Green Bay area; it now directly competes with Selmer.

¶ 7. Selmer sued Rinn and Ganther on February 11, 2008, seeking injunctive relief and compensatory damages. Rinn counterclaimed for unpaid commissions.

¶ 8. At a preliminary injunction hearing on February 18, 2008, Rinn argued the restrictive covenant contained in the stock option agreement was an overly broad and unenforceable restraint under WIS. STAT. § 103.465. The circuit court disagreed, finding no disparity in bargaining power between the parties:

> But here the more I've . . . reviewed [the contract], those rationale[s] that the legislature used to make an exception to the rule [that] contracts made by competent adults are enforceable, they didn't exist here. I mean the parties that entered this contract were competent adults, and there was no uneven bargaining power. And actually . . . Mr. Rinn benefited. He bought stock for less than what he ultimately sold it for. He received a benefit, but he gave away something to get that benefit.
>
> . . . .
>
> In any event, none of the rationale[s] for the exception to throw out covenants not to compete in [WIS. STAT. §] 103.465 are here when you look at this stock option agreement.

The circuit court enjoined Rinn, essentially adopting the stock option agreement's confidentiality and non-

competition provisions in the injunction. Rinn was prohibited from disclosing any confidential information obtained while working for Selmer. In addition, he was barred from contacting, soliciting, or attempting to divert business from "those customers or prospects with which Selmer is conducting or has conducted negotiations or to which Selmer has submitted a bid." At the close of the injunction hearing, the court confirmed this prohibition required Rinn to step down from the boards of former or potential Selmer customers.

¶ 9.   Despite the injunction, Rinn continued contacting Selmer customers and did not resign his position on the board of the Children's Museum.[3] On September 19, 2008, Selmer sought a contempt order as further relief for Rinn's continuing violation of the injunction. Selmer provided Rinn's deposition testimony in which he indicated that as of August 13, 2008, he had not even read the injunction. Benjamin Ganther, Ganther's owner and president, similarly indicated that although he was aware of the injunction's restrictions, he was not certain he read it and felt the circuit court's decision "ignored [twenty] years of case law . . . ."[4] The circuit court granted the contempt motion and awarded Selmer attorney fees and costs incurred between February 18, 2008, and October 15, 2009.

¶ 10.   Throughout the summer of 2008, Rinn and Ganther also stymied Selmer's attempts to obtain discovery materials, prompting several motions to compel.

---

[3] Selmer later provided deposition testimony showing Rinn contacted at least thirteen current or prospective Selmer customers on at least forty-nine occasions after the injunction issued.

[4] At deposition, Benjamin Ganther conceded he was not a lawyer. However, in a statement illustrating the appellants' cavalier attitude throughout this litigation, he claimed, "I play one on TV."

Despite Selmer's repeated reminders, Rinn and Ganther failed to timely respond to discovery requests and refused to appear at scheduled depositions on June 2, 2008.[5] Consequently, Selmer filed its first motion to compel on May 30, 2008. At a June 23, 2008, hearing, the circuit court ordered Rinn and Ganther to sufficiently respond to the discovery requests by 5:00 p.m. the next day, warning that failure to do so could result in "additional sanctions . . . including granting to Selmer all of the relief requested in its [complaint]."

¶ 11. On June 24, 2008, Rinn and Ganther provided incomplete responses to Selmer's discovery requests. Rinn and Benjamin Ganther were deposed on August 13, 2008, at which time Selmer discovered the June 24 responses omitted key information involving Rinn's communications with former and prospective Selmer customers. Following the depositions, Selmer notified Rinn and Ganther of the discovery deficiencies and requested they supplement their answers to avoid a second motion to compel. Neither Rinn nor Ganther responded.

¶ 12. Selmer filed a second motion to compel on August 28, 2008, which the circuit court granted. The court noted it had "warned the defendants that continued indifference to discovery requests would not be tolerated" and that Rinn and Ganther "have again forced the plaintiffs to file a motion to compel and on the eve of the scheduled motion hearing, provided the requested documentation." Satisfied lesser sanctions would do nothing to stem Rinn and Ganther's discovery abuse, the court dismissed Rinn's counterclaim.

---

[5] Rinn and Benjamin Ganther's depositions were originally scheduled for May 19, 2008, but were rescheduled at the deponents' request.

¶ 13.  A two-day trial commenced on February 17, 2009. The circuit court reiterated its earlier conclusion that Wis. Stat. § 103.465 did not apply to the restrictive covenant, and found the injunction's restrictions reasonable. Selmer was awarded damages for lost goodwill stemming from Rinn's breach and Ganther's tortious interference with Selmer's contractual relationships. In addition, the circuit court found both liable for tortious interference with Selmer's business expectancy. It also determined Selmer's damages were adequately proven and did not require expert testimony.

## DISCUSSION

¶ 14.  Rinn and Ganther argue four points on appeal. First, they claim Wis. Stat. § 103.465 applies to Rinn's noncompete agreement and renders it unenforceable. Second, they argue Selmer's damage award is unsupported by credible evidence. Third, they contest the circuit court's contempt finding because the preliminary injunction Rinn violated allegedly exceeded the scope of the restrictive covenant upon which it was based. Finally, they assert the circuit court erroneously dismissed their counterclaim as a sanction for discovery abuse.

### 1. Wisconsin Stat. § 103.465's Application to the Stock Option Agreement

■■

¶ 15.  "Wisconsin courts have always recognized the importance of protecting parties' freedom to contract." *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 710, 456 N.W.2d 359 (1990). We do this by ensuring each party performs according to its agreement. *Id.* We will ordinarily enforce the parties' agreement, provided the contract does not impose obligations that are con-

trary to public policy. *Id.* at 711; *Heyde Cos. v. Dove Healthcare, LLC*, 2002 WI 131, ¶ 10, 258 Wis. 2d 28, 654 N.W.2d 830.

■

¶ 16. WISCONSIN STAT. § 103.465 endorses "a strong public policy against the enforcement of unreasonable trade restraints on employees." *H & R Block E. Enters., Inc. v. Swenson*, 2008 WI App 3, ¶ 13, 307 Wis. 2d 390, 745 N.W.2d 421. A contract provision governed by this statute must: "(1) be necessary to protect the employer; (2) provide a reasonable time limit; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive to the employee; and (5) not be contrary to public policy."[6] *Id.*; *see also* George A. Richards, *Drafting and Enforcing Restrictive Covenants Not to Compete*, 55 MARQ. L. REV. 241, 243–48 (1972) (extracting five elements of a valid noncompete from *Lakeside Oil Co. v. Slutsky*, 8 Wis. 2d 157, 98 N.W.2d 415 (1959)). In light of § 103.465's mistrust of covenants not to compete, courts have applied the following canons of construction:

> (1) [they] are prima facie suspect; (2) they must withstand close scrutiny to pass legal muster as being reasonable; (3) they will not be construed to extend beyond their proper import or further than the language of the contract absolutely requires; and (4) they are to be construed in favor of the employee.

---

[6] In full, the statute provides:

**103.465 Restrictive covenants in employment contracts**

A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this subsection, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

*Farm Credit Servs. v. Wysocki*, 2001 WI 51, ¶ 9, 243 Wis. 2d 305, 627 N.W.2d 444; *Equity Enters., Inc. v. Milosch*, 2001 WI App 186, ¶ 12, 247 Wis. 2d 172, 633 N.W.2d 662.

¶ 17.  Most noncompete agreements previously examined by Wisconsin courts are inextricable from the employment relationship. In these cases, WIS. STAT. § 103.465's applicability is not in question. For instance, courts have customarily used § 103.465 to scrutinize noncompete agreements signed at the inception of employment as part of an employment arrangement. *See, e.g., Wysocki*, 243 Wis. 2d 305, ¶ 4; *Behnke v. Hertz Corp.*, 70 Wis. 2d 818, 820–21, 235 N.W.2d 690 (1975); *Lakeside Oil*, 8 Wis. 2d at 161–62; *Wausau Med. Ctr. v. Asplund*, 182 Wis. 2d 274, 279–82, 514 N.W.2d 34 (Ct. App. 1994); *General Med. Corp. v. Kobs*, 179 Wis. 2d 422, 426, 433–36, 507 N.W.2d 381 (Ct. App. 1993); *Fields Found., Ltd. v. Christensen*, 103 Wis. 2d 465, 469–71, 309 N.W.2d 125 (Ct. App. 1981); *see also Pollack v. Calimag*, 157 Wis. 2d 222, 228, 236–39, 458 N.W.2d 591 (Ct. App. 1990) (applying § 103.465 to a noncompete agreement signed a mere month after one-year employment agreement).

¶ 18.  Wisconsin courts have also applied WIS. STAT. § 103.465 in circumstances where the restrictive covenant is contained in a document other than the employment agreement, but the employer nonetheless enjoys a bargaining advantage over employees. For example, in *Dove Healthcare*, 258 Wis. 2d 28, ¶¶ 13–15, our supreme court determined two employers could not escape § 103.465's application by agreeing not to hire one another's workers instead of directly contracting with their employees. The supreme court has also scrutinized unilateral employer amendments to profit-sharing and retirement plans for compliance with § 103.465's re-

quirements. *Rosploch v. Alumatic Corp.*, 77 Wis. 2d 76, 78–80, 251 N.W.2d 838 (1977) (amendment to profit-sharing plan containing restrictive covenant was of questionable validity under § 103.465); *Holsen v. Marshall & Ilsley Bank*, 52 Wis. 2d 281, 284–87, 190 N.W.2d 189 (1971) (invalidating amendment to pension plan allowing employer to withhold fifty percent of retirement benefits if employee engaged in competitive business following severance).

¶ 19. Yet not all noncompete agreements fall within Wis. Stat. § 103.465's ambit. Before § 103.465's enactment, restrictive covenants were subject only to a "rule of reason" requiring "that a restrictive covenant not to compete after a term of employment should be reasonably necessary for the protection of the legitimate interests of the employer and at the same time should not be oppressive and harsh on the employee or injurious to the interests of the general public." *Lakeside Oil*, 8 Wis. 2d at 162; *see also Holsen*, 52 Wis. 2d at 284 and n.3. Although § 103.465's enactment did not materially alter the common law requirements of a valid covenant not to compete,[7] it did increase the degree of scrutiny such

---

[7] The common law requirements for a valid covenant not to compete bear a striking resemblance to the requirements of Wis. Stat. § 103.465 because the statute "does not change the prior law of what constitute unreasonable restraints . . . ." *Lakeside Oil Co. v. Slutsky*, 8 Wis. 2d 157, 159, 162, 98 N.W.2d 415 (1959). Indeed, the primary goal of Wis. Stat. § 103.465 was to legislatively alter our supreme court's decision in *Fullerton Lumber Co. v. Torberg*, 270 Wis. 133, 70 N.W.2d 585 (1955), in which the court rejected the blue pencil rule—a rule rendering an indivisible restrictive covenant void if any part of the restriction was unreasonable. *Streiff v. American Fam. Mut. Ins. Co.*, 118 Wis. 2d 602, 607–09, 348 N.W.2d 505 (1984). The supreme court's decision to enforce an invalid indivisible covenant to the extent it was reasonable—effectively converting an unreasonable ten-year

278

agreements receive. *See Wysocki*, 243 Wis. 2d 305, ¶ 9–10 (discussing four canons of construction applicable to covenants not to compete following § 103.465's enactment).

¶ 20.   In *Reiman Associates, Inc. v. R/A Advertising, Inc.*, 102 Wis. 2d 305, 306 N.W.2d 292 (Ct. App. 1981), we determined common law requirements, not WIS. STAT. § 103.465, governed the validity of a covenant not to compete incident to the sale of a business. In that case, Reiman, which produced a quarterly agricultural publication for Allis-Chalmers Corp., formed R/A Advertising to produce Allis-Chalmers advertisements. *Reiman*, 102 Wis. 2d at 307. Eventually, two R/A Advertising employees acquired one hundred percent of its stock from Reiman, and the businesses exchanged covenants not to compete:   Reiman promised not to hold itself out as an agricultural advertising agency and, in exchange for the covenant and corporate stock, R/A Advertising paid $200,000 and promised not to compete with Reiman for the right to produce the Allis-Chalmers publication. *Id.* at 307–08. Reiman brought suit when R/A Advertising submitted a bid to Allis-Chalmers to produce the trade publication. *Id.* at 308. We concluded covenants not to compete incidental to the sale of a business are subject neither to the "exacting scrutiny" mandated by WIS. STAT. § 103.465, nor the statute's prohibition on partial enforcement. *Id.* at 309–10. Applying the common law

time restriction into a reasonable three-year restraint—drew the ire of one legislator, who successfully obtained passage of legislation striking down in their entirety restraints containing overly broad and invalid provisions. *Id.* The result is the final sentence of § 103.465, rendering "[a]ny covenant, described in this subsection, imposing an unreasonable restraint ... illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint."

reasonableness standard, we determined the covenant was enforceable.

¶ 21.   Rinn was, of course, an employee at the time he contracted for the right to purchase corporate stock, and Selmer's motivation for the offer—made explicit on the first page of the agreement—was to "promote [Selmer's] growth and development . . . by providing increased incentives for key employees . . . ." However, unlike typical restrictive covenants, upon which a prospective employee's position may depend, there were no consequences attached to Rinn's refusal to accept the agreement. The circuit court found Rinn was not pressured to sign the stock option agreement, nor was his employment conditioned upon his doing so. Indeed, the circuit court found Rinn's refusal would not have affected his employment in any way.

¶ 22.   Accordingly, Selmer held no bargaining advantage over Rinn. Rinn was free to walk away from the transaction; instead, he seized the opportunity to purchase an ownership interest in Selmer's parent company. In exchange for Selmer's promise to make discount stock available, Rinn forfeited his ability to tap Selmer customers for one year following his employment.[8] Although Rinn has received the benefit of that bargain—he exercised the stock option and more than quadrupled his initial investment—he now seeks to evade the consequences of that choice by invoking Wis. Stat. § 103.465's protections. This case falls closer to the bargained-for exchange in *Reiman* than it does to the employment cases cited above.

---

[8] Had Rinn performed according to the covenant's terms and obeyed the preliminary injunction, the restrictions would have expired sometime between late August and mid-September of 2008. However, the circuit court extended the injunction until October 15, 2009, as a sanction for Rinn's contemptuous conduct.

¶ 23. Rinn contends our reasoning runs contrary to public policy because "any employer could avoid the rigid requirements of [Wis. Stat.] § 103.465 . . . by conveying one share of stock to its employee in conjunction with the execution of a restrictive covenant." Rinn's concern is unfounded for two reasons. First, restrictive covenants are analyzed by examining the totality of the circumstances. *Fields Found.*, 103 Wis. 2d at 471. We have established that where it appears the covenant cannot be separated from the employment relationship —either because the covenant is a condition of employment, or because the employer possesses an unfair bargaining advantage vis-à-vis the employee—the covenant receives the exacting scrutiny mandated by § 103.465. Second, covenants not to compete are contracts, subject to common law contract principles. *NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 836, 520 N.W.2d 93 (Ct. App. 1994). Consequently, they must be supported by adequate consideration. *Id.* at 836–37.

¶ 24. Having determined Wis. Stat. § 103.465 does not apply, we must determine whether the covenant not to compete satisfies the common law's rule of reason. In determining reasonableness, we examine whether the covenant is: "(1) reasonably necessary for the protection of the beneficiary;" (2) reasonable between the parties, "particularly as to the party restrained, considering time, space, purpose, and scope; and (3) not specially injurious to the public." *Reiman*, 102 Wis. 2d at 309. Whether a covenant is reasonable is a matter of law to be determined from the writing. *My Laundry Co. v. Schmeling*, 129 Wis. 597, 613, 109 N.W. 540 (1906).

¶ 25. The restrictive covenant is reasonably necessary to preserve Selmer's customer base. In his capacity as vice president of sales and marketing, Rinn maintained close relationships with Selmer's customers. "When an employer's customers or clients regularly deal with a particular employee, the employer's interest in protecting its stock of customers when that employee leaves may be a legitimate interest that justifies a reasonable restraint on the employee." *H&R Block*, 307 Wis. 2d 390, ¶ 15. "The customer goodwill that comes from a positive relationship between a customer and the employee with whom the customer regularly deals is a valuable asset of the employer's business, and, for some businesses, may be the most important asset." *Id.* As the circuit court recognized, personal relationships are important in the construction business.

¶ 26. The covenant is also reasonable as between the parties. It restricts only Rinn's solicitation of Selmer customers and disclosure of confidential Selmer information, not his employment. Rinn is free to use his skills, ability, and experience—but not his knowledge of, or relationships with, Selmer's customers—in other similar work. Although Rinn characterizes the covenant's non-solicitation language as "incredibly broad,"—presumably because it prohibits contact with all past, present, or prospective Selmer customers—our supreme court has acknowledged that restraints broader than the scope of actual customer contact may be permissible "where the person involved is a high-level management employee who is apt to have access to confidential business information." *Rollins Burdick Hunter, Inc. v. Hamilton*, 101 Wis. 2d 460, 469–70, 304 N.W.2d 752 (1981). Further, the covenant constrains Rinn's activities for only one year following his employment with Selmer, and its restric-

tions are reasonably related to the covenant's purpose, which is to preserve Selmer's customer base.

¶ 27.   Finally, the covenant offends no public interest. The agreement affects only Rinn's post-employment activities and permits any other business or entity to compete with Selmer. Any effect on Ganther's competitive ability is tangential; the covenant permits Ganther to utilize Rinn's skills, knowledge, and abilities to compete with Selmer, but does not allow Ganther to gain a competitive advantage by using Rinn's knowledge of, and relationships with, Selmer's customers. We conclude the covenant is reasonable and enforceable.

## 2. Validity of Selmer's Damage Award

¶ 28.   Rinn and Ganther next argue Selmer failed to prove its damages at trial. We apply a highly deferential standard of review to damage awards, affirming if there is any credible evidence which under any reasonable view supports the finding. *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2008 WI 126, ¶ 26, 314 Wis. 2d 560, 757 N.W.2d 803. "It is not [the reviewing court's] purpose to determine whether damage awards are high or low, nor to substitute [its] judgment for that of the jury or the trial court but rather to determine whether the award is within reasonable limits." *Id.*, ¶ 58 (quoted source omitted).

¶ 29.   The circuit court awarded Selmer the following amounts:   (1) $42,996 for time and expenses incurred in negotiating and working on projects Rinn later diverted to Ganther; (2) $13,486 for time and expenses

incurred in attempting to retrieve business lost or damaged because of Rinn's conduct; and (3) $17,000 for lost goodwill. The award was supported by (1) testimony and documentary evidence estimating $78,000 in expenditures for projects later diverted to Ganther; (2) documentary evidence estimating the employee replacing Rinn spent ten percent of his time—or, in salary terms, $13,486—repairing damage Rinn caused, instead of pursuing other sales leads; and (3) testimony indicating Selmer's reputation and ability to obtain new projects had been damaged. The damage awards are supported by credible evidence and are within reasonable limits.

¶ 30. Rinn and Ganther assert we must reverse the damage awards as unsupported by expert testimony and based upon "general statements that [Selmer] was damaged." We disagree. The type of evidence presented to establish damages may affect its credibility and weight, but does not supply a basis for overturning a damages award. *See Tony Spychalla Farms, Inc. v. Hopkins Agric. Chem. Co.*, 151 Wis. 2d 431, 442–43, 444 N.W.2d 743 (Ct. App. 1989). Moreover, we have acknowledged that damages for breach of a noncompete clause do not require "mathematical certainty . . . because such damages by their very nature cannot be 'definitely ascertained or determined.' " *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2007 WI App 269, ¶ 20, 306 Wis. 2d 470, 744 N.W.2d 300 (quoting *Reiman*, 102 Wis. 2d at 323–24), *aff'd in part & rev'd in part on other grounds*, 314 Wis. 2d 560.[9] "The party who has been determined to have breached such a contract

---

[9] For ease of reference, we shall refer to our decision in *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2007 WI App 269, 306 Wis. 2d 470, 744 N.W.2d 300, as *Anderson I* for the remainder of this opinion.

should not be permitted to profit from that difficulty of proof." *Id.*, ¶ 28.

### 3. Validity of the Circuit Court's Contempt Finding

¶ 31.   Rinn argues the circuit court erred when finding him in contempt because the scope of the preliminary injunction exceeds the scope of the restrictive covenant. When reviewing a contempt finding, we do not set aside the trial court's factual findings unless they are clearly erroneous. *City of Wisconsin Dells v. Dells Fireworks, Inc.*, 197 Wis. 2d 1, 23, 539 N.W.2d 916 (Ct. App. 1995). However, interpretation of the injunction upon which the contempt finding is based is a question of law we determine de novo. *Id.* Ultimately, a trial court's use of its contempt power is reviewed to determine if the court properly exercised its discretion. *Id.*

¶ 32.   Rinn does not claim the circuit court erred by granting injunctive relief. Instead, he challenges the scope of the injunction, arguing it prohibits him from engaging in activities permitted under the restrictive covenant. Ordinarily, the circuit court enjoys broad discretion when crafting injunctive relief. *Hoffmann v. Wisconsin Elec. Power Co.*, 2003 WI 64, ¶ 23, 262 Wis. 2d 264, 664 N.W.2d 55. However, in the noncompete context, we have determined a circuit court erroneously exercises its discretion when it fashions an injunction broader than the restrictive covenant upon which the injunction is based. *See Anderson I*, 306 Wis. 2d 470, ¶ 55.

¶ 33.   The injunction in this case is not overbroad. Rinn claims the restrictive covenant prohibits him from

"contacting or attempting to contact any past, present, or future customer of Selmer with whom the Company has submitted a bid." This is not a correct statement of the covenant's restrictions, which require Rinn to refrain from soliciting "any past, present, or future Customer of the Company *or* any person with whom the Company is conducting negotiations, or to whom the Company has submitted a bid . . . ." (Emphasis added.) Contrary to Rinn's assertion, the circuit court adopted only the latter conditions in the preliminary injunction, and enjoined Rinn from "diverting or attempting to divert any business from [Selmer], including from those customers or prospects with which Selmer is conducting or has conducted negotiations or to which Selmer has submitted a bid." Rinn's claim is unpersuasive because the injunction is actually more permissive than the restrictive covenant.

¶ 34. Rinn also argues the injunction's breadth left him in doubt about which Selmer customers he could permissibly contact. His argument is at best implausible. Rinn made no effort to understand or obey the preliminary injunction until questioned six months after its entry. During that time, the circuit court found Rinn "pretty much went on in life doing what [he] wanted to do . . . ." Rinn's claimed bewilderment regarding the scope of the injunction is an ex post facto position of convenience that merits no further consideration.

### 4. Dismissal of Rinn's Counterclaim as a Sanction for Discovery Abuses

¶ 35. Finally, Rinn and Ganther assert the sanctions for their discovery violations were unreasonable. A circuit court has broad discretion to impose sanctions in

response to a discovery violation. *Sentry Ins. v. Davis*, 2001 WI App 203, ¶ 19, 247 Wis. 2d 501, 634 N.W.2d 553. A range of sanction is available, including dismissal of an action or any part thereof. Wis. Stat. § 804.12(2)(a)3. Dismissal is warranted only for egregious conduct without any clear and justifiable excuse. *Sentry Ins.*, 247 Wis. 2d 501, ¶ 20. We will uphold a discovery sanction as long as the record shows the court applied the proper legal standard to the relevant facts using a demonstrated rational process to reach a reasonable conclusion. *Id.*, ¶ 19.

¶ 36.  Rinn and Ganther first argue the circuit court erroneously dismissed Rinn's counterclaim because it did not find he acted with bad faith or engaged in egregious misconduct. A circuit court need not make an explicit egregiousness finding as long as the facts provide a reasonable basis for the court's implicit finding. *Teff v. Unity Health Plans Ins. Corp.*, 2003 WI App 115, ¶ 14, 265 Wis. 2d 703, 666 N.W.2d 38. Egregious misconduct is conduct that, though unintentional, is extreme, substantial, and persistent. *Id.* At bottom, Rinn and Ganther claim their discovery abuses were not extreme enough to warrant dismissal. We disagree.

¶ 37.  The circuit court's decision adequately established grounds for dismissal. When granting Selmer's second motion to compel, the circuit court noted it had "sanctioned defendants in the past for failure to comply with discovery" and "warned that continued indifference to discovery requests would not be tolerated." Despite these admonitions, Rinn and Ganther provided incomplete discovery responses which they failed to supplement even after Selmer gave them the opportunity to do so.

¶ 38. In sanctioning a second time, the circuit court also implicitly rejected Rinn and Ganther's "justifiable excuse" argument. At the motion hearing, counsel for Rinn and Ganther claimed they first learned their discovery responses were inadequate during depositions of their clients and at the same time as Selmer. This does not explain their subsequent failure to supplement responses as Selmer requested and as required by state law. *See* WIS. STAT. § 804.01(5)(c) (duty to supplement responses may be imposed at any time prior to trial through new requests for supplementation of prior responses). The circuit court properly found sanctions more severe than attorney fees were warranted to prevent future discovery abuses.

## CONCLUSION

¶ 39. In sum, we conclude the common law's rule of reason, not WIS. STAT. § 103.465, governs the validity of the covenant not to compete contained in the stock option agreement. Under that rule, the covenant prohibiting Rinn from soliciting past, present or prospective Selmer customers is reasonable and enforceable. Furthermore, we conclude Selmer supplied an adequate basis for the trial court's damages award. Finally, the circuit court did not erroneously exercise its discretion when finding Rinn in contempt, nor when dismissing his counterclaim as a sanction for repeated discovery infractions. We affirm the circuit court on each issue.

*By the Court.*—Judgment affirmed.