Stephen LAUGHLAND, Plaintiff-Respondent,

v.

John BECKETT, Defendant-Appellant.

Court of Appeals

*No. 2014AP2393. Submitted on briefs June 2, 2015.
—Decided August 25, 2015.*

2015 WI App 70

(Also reported in 870 N.W.2d 466.)

150

154

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Basil M. Loeb* of *Schmidlkofer, Toth, Loeb & Drosen, LLC* of Wauwatosa.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas A. Ogorchock* of *Miller and Ogorchock, S.C.* of Milwaukee.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. KESSLER, J. John Beckett appeals a judgment of the circuit court, following a bench trial. The circuit court found that Beckett defamed Stephen Laughland by creating a Facebook page in

Laughland's name and posting numerous items that defamed Laughland and disparaged Laughland's character. The circuit court found Beckett did all this with malicious intent, and awarded both general and punitive damages. Beckett argues on appeal that his postings were beyond the applicable statute of limitations for defamation actions, his posts were not defamatory, and that the evidence does not support the damages awarded. We affirm.

## BACKGROUND

¶ 2. The relevant facts are not in dispute. On or about January 10, 2010, Beckett created a Facebook page under the name "Stephen Laughland II." Beckett used the email address consumer.advocate.WI@gmail.com. At the time, Laughland was an adjunct lecturer at multiple Milwaukee-area schools, including Marquette University. On January 28, 2010, Beckett, using the "consumer.advocate.WI" email address, sent an email to Laughland's Marquette University email address, berating Laughland for his "total disregard for the financial freedoms that this country provides." Then Beckett went on to accuse Laughland of "manipulating the system," and threatened "[t]here comes a time when people such as yourself get exposed. I want you to know that your day has come . . . . I can say that some day soon that you will pay the price for your financial recklessness and dishonesty." Laughland contacted Marquette University security and was referred to local law enforcement. At the time, Laughland did not know about the Facebook page in his name.

¶ 3. On April 10, 2010, Laughland received an email from an acquaintance saying: "I received a

[Facebook] friend request from you however, it must be someone using your name. It says horrible things about you etc. Just a FYI, you may want to report it." Laughland then "google searched" his name and discovered the Facebook account.

¶ 4. The Facebook account had a picture of Laughland and many negative comments, purporting to be by Laughland about himself. The comments began in January 2010 and continued through April 2010. It is undisputed that Beckett, as the creator and administrator of the page, posted the comments. The initial comment, posted in January 2010, stated, in part:

> This is what I would like to consider a public service profile for anyone that is not aware of Mr. Laughland's total disregard for the financial freedoms we as consumers cherish. It is due to people like this that Banks are in trouble, we pay more to use our credit cards, and it is hard to trust people.
>
> . . . .
>
> I was asked to see if I could help people avoid this preying swindler.
>
> . . . .
>
> Since he knows so much about bank manipulation Marquette must have beleived [sic] that he was an excellent choice [sic] to teach Bank Management.

¶ 5. Multiple people became "friends" with the Facebook page at issue, allowing them to view comments and posts made on and from the Facebook page. In March 2010, Beckett made the following post, still purporting to be Laughland commenting on himself:

> Manipulation, control and, deceipt [sic]! I would like to continue my useless life. I have no problem being a

157

debt to society as long as I can continue [to] manipulate people, banks, and credit card companies. I wonder what my children think about having such a loser for a father.

¶ 6. Beckett persisted, and in April 2010 posted the following on the fictitious Laughland Facebook page:

It is nice being a loser and taking advantage of banks and credit card companies. I am not sure why more people have not caught onto the fact that I am a low life manipulative person.

¶ 7. On April 21, 2010, Peggy Hoppa Jones, an acquaintance of Laughland's, sent a message to the Facebook page stating that she was "looking to reconnect with Steve and came across this site." Jones further messaged: "Who are you? I was not aware of any of this info? Where did you find it?" Beckett responded: "I do this in hopes that others may benefit from trusting avoiding corrupt individuals . . . I see my self [sic] as offering a public service."

¶ 8. When Laughland became aware of the Facebook page, Laughland suspected Jean Placke, the mother of his child, had created the page out of spite because the two were embroiled in a custody battle. Laughland hired an attorney to investigate whether Placke created the page. It was subsequently determined that Beckett, who was Placke's boyfriend at the time, was the actual creator of the fictitious Laughland Facebook page.[1] Beckett admits he had never met Laughland.

---

[1] Beckett and Placke were in an on-and-off relationship for about a year prior to the creation of the Facebook page. Beckett knew about Placke's custody battle with Laughland. Beckett stated that Placke did not know about the Facebook account.

¶ 9. In July 2012, Laughland filed the defamation action underlying this appeal against Beckett. Beckett moved for summary judgment to dismiss Laughland's claims. Beckett argued that Laughland's claims were barred by the two-year statute of limitations for defamation that existed at the time the Facebook page was created in January 2010. However, in February 2010, the statute of limitations for defamation was modified to extend the time for filing a claim to three years. Because Beckett's last post was in April 2012, the circuit court concluded that the three-year statute of limitations applied to Laughland's claims and denied the motion.

¶ 10. Prior to trial, the parties stipulated that Beckett created the Facebook page and wrote all of the posts about Laughland. At trial, Beckett maintained that the posts were not defamatory because (1) the statements were true based on facts in public records, or because (2) the statements were simply Beckett's opinions.

¶ 11. Beckett testified that as a result of "google" searches and searches on the Wisconsin Circuit Court Access system, he found records of Laughland's foreclosure and bankruptcy, and concluded that Laughland's financial struggles were the result of "irresponsible reckless[ness]." These records, Beckett claimed, inspired him to create the Facebook page chastising Laughland. Beckett admitted, however, that he had no documentation to support his conten-

---

In an email dated December 29, 2011, Beckett told Placke: "I hope that you understand that although you told me not to do anything related to [Laughland], I only did it because I loved you and felt a need for others to know the kind of person that he is so they would not fall victim to his manipulative way of life."

tion that Laughland "manipulated the system." Beckett copied a picture of Laughland from the Marquette University website to use as the profile picture on the fictitious Laughland Facebook page. Beckett also stated that he invited Laughland's friends to become Facebook "friends" with the page because he hoped to "try and inform people of Mr. Laughland's background so they wouldn't fall victim to any of his — what I saw in my opinion as . . . manipulation, and deceit. And I invited his friends to be my friends."

¶ 12. The circuit court found that Beckett defamed Laughland. The court said:

> [T]o say my opinion is, and there's a reasonable basis to believe that this man is a swindler, that [t]his man is a bank manipulator, et cetera; I don't think you can do that legally. I just don't think that you can enter and say that's just my opinion . . . when you are publishing, et cetera.
>
> The real corker in that one, I think, is motivation here . . . . I didn't buy the explanation that I was doing this because I want to protect other people.
>
> There was one and only one motivation for this. I guess you can break it down into two. It was the ever loveable Miss Placke in an attempt to impress her and an attempt to rundown in her eyes Mr. Laughland. You put all of that together and you've got the ill will, you've got the malice, you've got the defamatory statements, et cetera.

¶ 13. The court also found that Laughland was entitled to $15,000 in general damages and $10,000 in punitive damages.

## DISCUSSION

¶ 14. Beckett appeals, arguing that: (1) the circuit court erroneously denied summary judgment on

his statute of limitations claim; (2) his statements were not defamatory; and (3) the circuit court "failed to justify" the damages awards.

## I. Statute of Limitations.

¶ 15. Our review of a decision on summary judgment is *de novo*. *See Behrendt v. Gulf Underwriters Ins. Co.*, 2009 WI 71, ¶ 11, 318 Wis. 2d 622, 768 N.W.2d 568. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We view the facts in the light most favorable to the nonmoving party. *See id.* Whether the statute of limitations has run on a claim is a question of law that we review *de novo*. *Cianciola, LLP v. Milwaukee Metro. Sewerage Dist.*, 2011 WI App 35, ¶ 19, 331 Wis. 2d 740, 796 N.W.2d 806.

¶ 16. In January 2010, a two-year statute of limitations existed for defamation claims.[2] On February 25, 2010, the statute was amended by 2009 Wis. Act 120 to allow for a three-year statute of limitations.

¶ 17. Relying on our decision in *Ladd v. Uecker*, 2010 WI App 28, 323 Wis. 2d 798, 780 N.W.2d 216, Beckett argues that all of Laughland's claims are time-barred because they pertain to a "single publica-

---

[2] In January 2010, Wis. Stat. § 893.57 read:

**Intentional torts.** An action to recover damages for libel, slander, assault, battery, invasion of privacy, false imprisonment or other intentional tort to the person shall be commenced within 2 years after the cause of action accrues or be barred.

Effective February 25, 2010, the "2" years was changed to "3" years.

tion" established in January 2010—before the statute of limitations extension. Beckett acknowledges that the publications he made in March and April 2010 fall within the February 2010 extension of the statute of limitations to three years. *Uecker* is not determinative of the outcome here. The facts in *Uecker* involved a single internet posting by the two defendants—Robert Uecker and the Milwaukee Brewers. *Id.*, ¶ 1. Ann Ladd alleged that both defendants depicted her as a stalker when: (1) Uecker posted an affidavit filed in a court proceeding to obtain a harassment injunction against Ladd; and (2) the Milwaukee Brewers posted an online account of Ladd being removed from a Brewers baseball spring training game. *Id.*, ¶ 3. Ladd asserted that both postings were still available online two years after they were posted, and that she was defamed each time a new visitor of those websites viewed the postings. *Id.*, ¶ 11. We disagreed, and adopted a "single publication rule," specifically as to publications on the internet. *Id .*, ¶ 12 We held that because the party posting material on the internet has no control over other websites' use or dissemination of that material, a plaintiff alleging defamation based on the posting has a single cause of action arising at the first instance of publication, regardless of how many people see the publication over time after it is posted.[3] *Id.*, ¶¶ 11–12.

¶ 18. Unlike the facts in *Uecker*, Beckett actively updated the Facebook page by adding additional derogatory posts about Laughland. Beckett actively

[3] The rule prevents the constant tolling of the statute of limitations, holding that the statute of limitations begins to run when the allegedly defamatory material is first made available to the public by posting it on a website. *See* Restatement (Second) of Torts § 577A(3) (1977).

sought new audiences for these postings. Beckett's behavior demonstrates a continuing course of conduct that existed until April 2010.[4] Because Beckett continued to actively publish material on the Facebook page until April 2010, the statute of limitations on Laughland's claims did not begin to run until Beckett's last publication.

## II. Defamation.

¶ 19. Beckett argues that his Facebook posts were not defamatory because: (1) the statements were substantially true; (2) the statements were simply his opinions; and (3) Laughland did not prove harm to his reputation.

■

¶ 20. When reviewing the circuit court's findings in a bench trial, we will not overturn the circuit court's factual findings unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2). We search the record for evidence to support the court's factual findings. *See Johnson v. Merta*, 95 Wis. 2d 141, 154, 289 N.W.2d 813 (1980).

---

[4] *See Westphal v. E.I. du Pont de Nemours & Co.*, 192 Wis. 2d 347, 369, 531 N.W.2d 386 (Ct. App. 1995) (In cases involving medical malpractice, where continuous negligent treatment has been provided, the statute of limitations begins to run from the last date of negligent conduct.); *State v. Miller*, 2002 WI App 197, ¶ 13, 257 Wis. 2d 124, 650 N.W.2d 850 ("Whether a particular criminal offense is continuing in nature is significant to the application of the statute of limitations because the statute of limitations for a continuing offense does not run until the last act is done which, viewed alone, is a crime.").

██

¶ 21. "The first inquiry in evaluating a defamation claim is whether the communication is capable of a defamatory meaning, that is, whether the words complained of are 'reasonably capable of conveying a defamatory meaning to the ordinary mind and whether the meaning ascribed by [the] plaintiff[] is a natural and proper one.'" *Bauer v. Murphy*, 191 Wis. 2d 517, 523, 530 N.W.2d 1 (Ct. App. 1995) (citation omitted; brackets in *Bauer*). "The determination is one of law for the [circuit] court, and our review is de novo." *Id.* (internal citation omitted).

¶ 22. "The elements of a common law action for defamation are: (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the one defamed; and (3) the communication is unprivileged and tends to harm one's reputation, lowering him or her in the estimation of the community or deterring third persons from associating or dealing with him or her." *Uecker*, 323 Wis. 2d 798, ¶ 8. If we determine that the statements at issue are defamatory, we must consider the defenses alleged. *See id.* "Truth is a complete defense." *Id.* Opinions are also considered defenses to defamation under certain circumstances. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990) (Under the common law principle of "fair comment," legal immunity is afforded for the honest expression of opinion on matters of public interest *when based upon a true or privileged statement of fact not made solely for the purpose of causing harm.*).

## A. Beckett's statements were *not* substantially true.

¶ 23. "Substantial truth" is a defense to a defamation action. *Prahl v. Brosamle*, 98 Wis. 2d 130, 141, 295 N.W.2d 768 (Ct. App. 1980), *abrogated on other grounds by Wilson v. Layne*, 526 U.S. 603 (1999). The doctrine of substantial truth provides that " '[s]light inaccuracies of expression' " do not make the alleged defamation false. *Lathan v. The Journal Co.*, 30 Wis. 2d 146, 158, 140 N.W.2d 417 (1966) (citation omitted). Here, the circuit court found that Beckett failed to establish that his statements were "substantially true" or "slight inaccuracies of expression." The record supports the circuit court's findings.

¶ 24. Among the many assertions made by Beckett on the fictitious Laughland Facebook page are the following:

- Laughland is "a low life" ;
- Laughland is a "preying swindler";
- Laughland is a "loser";
- Laughland "defrauded banks";
- Laughland engaged in "underhanded business practices";
- Laughland was "corrupt" and a "debt to society";
- Laughland "manipulated banks and credit card companies"; and
- If Marquette University offered a class in bank manipulation, Laughland would be the perfect candidate.

Beckett claims that these statements are all based on public records. In fact, they are based only on Beckett's speculation about the meaning of those public records.

Beckett cites foreclosure, bankruptcy and collection actions filed by several banks against Laughland as support for his (Beckett's) contention that Laughland committed "fraud" and "misrepresentation." At trial, however, Beckett provided no evidence that the claims made by the banks involved allegations of Laughland's fraud, deceit or bank "manipulation." Indeed, Beckett conceded that he had virtually no documentation to support his claims. We conclude that the "public record" documentation before us contains no evidence that Laughland "defrauded banks," was "corrupt," was "a swindler," had "underhanded business practices," or "manipulated banks and credit card companies."

¶ 25. Apparently as part of Laughland's August 15, 2013[5] response to Beckett's discovery demands, Beckett obtained redacted copies of Laughland's tax returns from 2009 through 2012. These returns report business losses. Beckett claims the business losses are evidence that Laughland was dishonest with taxing authorities, making Beckett's posts at least substantially true. In the context of this defamation suit, that claim is a non-starter. Beckett posted his defamatory allegations between January 10, 2010, and April 27, 2010. Beckett does not demonstrate in the record that he had those documents at the time of his defamatory posts. Thus, Laughland's tax returns could not have been the source of any knowledge Beckett had when he was posting on the fictitious Laughland Facebook page.

---

[5] Laughland's Answer to Interrogatories and Document Production Demands, which resulted in disclosure of the 2009–2012 Income Tax Returns, was signed by Laughland and his attorney on August 13, 2013. The record does not identify any earlier date when the tax returns came into Beckett's possession.

166

¶ 26. There is not a scintilla of support in the record for Beckett's claim that Laughland engaged in fraudulent tax activities. Similarly, Beckett's public declarations that Laughland's foreclosure and bankruptcy constituted fraud and made Laughland a "corrupt" "low life loser," among other things, are nothing more than Beckett's speculation. As such, Beckett's attempts to defend his defamatory postings as "substantially true" have no support in the record. Beckett's posts were defamatory and intentionally published by Beckett, who had no reason to believe his statements were substantially true.

## B. Beckett's statements were not protected opinions.

¶ 27. Having determined that the statements are defamatory, we turn to whether they are protected by a privilege. Beckett argues that the posts were simply statements of his opinion. As explained in Wis JI— Civil 2500:

> Generally, the defamatory communication must be a statement of fact. An expression of opinion generally cannot be the basis of a defamation action. However, where the defamer departs from expressing "pure opinion" and communicates what the courts have described as "mixed opinion," then liability may result . . . "Mixed opinion" is a communication which blends an expression of opinion with a statement of fact. This type of a communication is actionable if it implies the assertion of undisclosed defamatory facts as the basis of the opinion.

(Internal citation omitted.) However, "communications are not made nondefamatory as a matter of law merely

because they are phrased as opinions, suspicions or beliefs." *Converters Equip . Corp . v. Condes Corp .*, 80 Wis. 2d 257, 263–64, 258 N.W.2d 712 (1977).

¶ 28. We conclude that Beckett's statements were all variations of the underlying (and unsubstantiated) factual assertion that Laughland engaged in fraudulent financial activity. Beckett's Facebook posts did not merely opine that Laughland was a "low life loser." Rather, Beckett made specific allegations—many written in the first person—accusing Laughland of defrauding banks, "manipulating banks and credit card companies" and engaging in "underhanded business practices." As stated, the record contains no factual basis for Beckett's assertions, even if we view them as "opinions." The evidence supports the circuit court's conclusion that Beckett's statements were not protected "opinions."

## C. Harm to Laughland's Reputation.

¶ 29. Beckett argues that there is no evidence that anyone, other than the person who reported the page to Laughland, viewed the Facebook page. Thus he contends that his actions were not defamatory because no harm to Laughland's reputation has been proven.

¶ 30. "The distinction between defamation, which is actionable by itself, or per se, and that which requires proof of special damages is not the same as the distinction between language which may be defamatory on its face or may convey a defamatory meaning only by reason of extrinsic circumstances." *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 460, 113 N.W.2d 135 (1962). "If the only possible meaning or

meanings of the communication under all the facts in the case are defamatory as applied to the plaintiff and could only be reasonably so understood by the recipient, the court may hold the language defamatory as a matter of law." *Id.* at 461–62. A communication defames if it tends to damage one's reputation in the community or to deter other persons from associating with the defamed individual. *Converters Equip. Corp.*, 80 Wis. 2d at 262.

¶ 31. The record supports the circuit court's conclusion that Beckett's Facebook posts intended to, and did, devalue Laughland's reputation. By April 2010, the Facebook page had six "friends"—people whom Beckett thought were connected to Laughland and actively sought to view the page. The page was named after Laughland. When Laughland's acquaintance notified Laughland of the page, she wrote that someone was saying "horrible" things about him. Beckett reached out to another acquaintance of Laughland's, while using Laughland's name, with the message: "Thanks for asking a low life like me to be your friend. If you ever need help defrauding a bank, I am your man!"

¶ 32. Beckett's comments, by the very nature of existing on a Facebook page, were accessible to other Facebook users. The record establishes that Beckett's comments were indeed viewed by third parties, as the page had six "friends." Beckett made comments implying that Marquette University was risking its reputation by employing Laughland. All of the defamatory comments, placed on a social media page accessible to other social media users, and Beckett's active efforts to

solicit "friends," support the circuit court's conclusion that Beckett intended to, and indeed did, lower Laughland's reputation.

## III. Damages.

¶ 33. Lastly, Beckett contends that there is insufficient proof to support the circuit court's award of general and punitive damages to Laughland. We disagree.

¶ 34. "We apply a highly deferential standard of review to damage awards, affirming if there is any credible evidence which under any reasonable view supports the finding." *See The Selmer Co. v. Rinn*, 2010 WI App 106, ¶ 28, 328 Wis. 2d 263, 789 N.W.2d 621. In Wisconsin, the award of punitive damages is within the discretion of the factfinder. *See Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 626, 563 N.W.2d 154 (1997). "We are reluctant to set aside an award merely because it is large or we would have awarded less." *Id.*

¶ 35. "A person's reputation and good name is of inestimable value to him and once it has been besmirched by another through carelessness or malice restoration is virtually impossible. Protection of a citizen's good name is a proper concern of the state." *Denny v. Mertz*, 106 Wis. 2d 636, 658, 318 N.W.2d 141 (1982) (footnote omitted). The nonpecuniary injury that damages in defamation cases compensate for include: impairment to reputation and standing in the community, personal humiliation, and mental anguish and suffering. *Id.* at 659. In defamation actions, general damages are presumed to "follow inevitably from

defamatory imputation, and . . . are often recoverable without proof of injury." *Dalton v. Meister*, 52 Wis. 2d 173, 191, 188 N.W.2d 494 (1971).

██ ██

¶ 36. Although proof of specific economic loss by reason of the defamation is not required in order to recover general damages for impairment of one's reputation and standing in the community, at trial Laughland presented a summary of what he considered his economic losses as a result of Beckett's defamatory postings.[6] Laughland did not estimate the monetary value of the damage to his "social reputation," but described his reaction to learning of the fictitious Laughland Facebook page as follows:

> I was very concerned for my reputation. I did a Google search and [it] came up as a first hit[,] just my name and so I know everyone could see it.
>
> . . . .
>
> [W]hen I saw this situation unfold and realized that there was a profile of the nature that was out there[,] I had sheer panic because I knew without hesitation that a lot of people were going to see it, especially after I . . . found out it hit a top Google search.
>
> . . . .
>
> I was mortified and petrified that something bad was, you know, potentially was going to happen, because of my reputation because of that sitting there.

---

[6] The circuit court did not award damages based on Laughland's claimed economic losses. Although Laughland does not challenge this finding on appeal, he estimated, among other losses, that he lost $58,950 in income as an adjunct professor by the time of trial, and had incurred $41,969 in legal expenses and costs, all as a result of Beckett's defamation.

¶ 37. The circuit court acknowledged Laughland's humiliation and found that the Facebook posts undoubtedly diminished Laughland's reputation. In view of the repeated and continuing effort Beckett expended to disparage and humiliate Laughland, and the reactions of at least two people to the fictitious Laughland Facebook page, the record supports the circuit court's conclusion that $15,000 for general damage was reasonable. The circuit court was not required to provide a formulaic breakdown of its damages award. *See Prahl v. Brosamle*, 142 Wis. 2d 658, 667, 420 N.W.2d 372 (Ct. App. 1987) (We will not reverse a circuit court's damages determination if the record shows that the court exercised discretion and provides a reasonable basis for the court's decision.). The court reasonably exercised its discretion as to general damages.

¶ 38. As to punitive damages, Wisconsin recognizes "express malice" as a basis for punitive damages in a private defamation action. *See Calero v. Del Chem. Corp.*, 68 Wis. 2d 487, 506, 228 N.W.2d 737 (1975). "Express malice is that malice described . . . that is ill will, envy, spite, revenge." *Id.* at 499–500 (citations and multiple sets of quotation marks omitted). Express malice is also known as "common-law malice." *Id.* at 500 (citation and quotation marks omitted). Punitive damages are awarded "to punish the wrongdoer for his malice and to deter others from like conduct . . . . Consideration should be given to the wrongdoer's ability to pay and the grievousness of his acts, the degree of malicious intention, and potential damage which might have been done by such acts as well as the actual damage." *See Malco, Inc. v. Midwest Aluminum Sales*, 14 Wis. 2d 57, 66, 109 N.W.2d 516 (1961).

¶ 39. The circuit court found that Beckett intended to damage Laughland's reputation out of "love" for, and in order to improve his own standing with, Laughland's former girlfriend, Placke. The circuit court found Beckett's conduct was intentional and malicious. Thus, the circuit court concluded an award of $10,000 in punitive damages was appropriate to punish Beckett's conduct and to deter others from future conduct of a similar nature. The punitive damage award was two-thirds of the general damages awarded. Wisconsin courts have approved punitive damages in ratios far exceeding compensatory damages. *See Trinity Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 65, 261 Wis. 2d 333, 661 N.W.2d 789 (upholding a punitive damages award that had a 7:1 ratio to the compensatory damages); *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2008 WI 126, ¶ 87, 314 Wis. 2d 560, 757 N.W.2d 803 (finding punitive damages in an amount twice that of the compensatory damages were not excessive). Here, a punitive damage award that is merely sixty-six percent of the general damage award does not shock our conscience. The circuit court did not erroneously exercise its discretion.

¶ 40. For the foregoing reasons, we affirm the circuit court.

*By the Court.*—Judgment affirmed.