COURT OF APPEALS
DECISION
DATED AND FILED

February 12, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP546**

STATE OF WISCONSIN

Cir. Ct. No. 2021CV357

IN COURT OF APPEALS
DISTRICT II

---

JOHN P. HALUSAN,

   PLAINTIFF-RESPONDENT,

 V.

THE SCAN GROUP, INC.,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Waukesha County: MICHAEL P. MAXWELL, Judge. *Order affirmed; judgment affirmed in part, reversed in part and cause remanded with directions*.

Before Neubauer, Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. The Scan Group, Inc. appeals from an order denying application of the doctrine of laches as an affirmative defense to claims brought against it by its former sales manager, John P. Halusan, and from a judgment against it in favor of Halusan entered after a trial to the court. We affirm the trial court's order rejecting application of the doctrine of laches to bar Halusan's claims because Scan Group failed as a matter of law to establish that it suffered prejudice from any passage of time before Halusan brought his claim. We also affirm the judgment of the trial court with respect to Halusan's breach of contract and Wisconsin Wage Act claims. Finally, we affirm the trial court's award of damages in part, reversing only with respect to the award of commissions and bonuses based on Halusan's 2020 sales, which we conclude are not supported by credible evidence. We remand to the trial court with directions to enter a modified damages award as discussed below.

## I. Background

¶2 Halusan filed suit on February 25, 2021, seeking money that he alleged was owed to him under a written employment contract and withheld by Scan Group in violation of WIS. STAT. ch. 109, Wisconsin's Wage Payments, Claims and Collections law ("Wisconsin Wage Act").[1] The contract signed by Halusan and Scan Group had an effective date of November 11, 2010, and provided in Article I that Halusan would serve as Scan Group's Sales Manager, reporting to the president of the company. The contract specified that Halusan would carry out the responsibilities assigned to him by the company, "including,

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

but not limited to those responsibilities detailed in [the] job description attached … as Exhibit A" to the contract. That job description was sub-titled "Account Executive Position Description" and described a sales position; no managerial duties are explicitly mentioned in the contract.

¶3 In Article III, the contract provided that Halusan's compensation would consist of an annual salary of $125,000; commissions on Halusan's own annual net sales at a rate of 1.5% if Halusan exceeded $400,000 in annual net sales and a rate of 2.5% if Halusan exceeded $550,000 in annual net sales (paid monthly); and a bonus of 1.5% on all of Scan Group's annual net sales exceeding $7,000,000 (paid annually).

¶4 Pursuant to Article II, the term of employment under the contract was three years from the effective date, with automatic renewal for one-year periods unless either party terminated the agreement "by written notice not less than 60 days prior to expiration of the then-current term." The contract specified that "[a]ll notices or other communications required or permitted [by its terms] shall be in writing" and that they would be deemed effective on certain dates depending on the method of delivery. Any modifications or amendments to the contract had to be "in writing, executed by both parties."

¶5 Both parties did sign an amendment to the agreement on November 15, 2011, which reduced Halusan's monthly salary by $400 until February 4, 2012. This was the only written and signed amendment to Halusan's contract with Scan Group for the duration of his employment.

¶6 Some time in the fall or early winter of 2013—outside of the sixty-day notice period required for termination or non-renewal of the contract after the term ending November 10, 2013—Scan Group's business manager met

with Halusan face-to-face. He told Halusan that Halusan would no longer be receiving a commission pursuant to the parties' contract, which he said "was done." Despite that communication, a spreadsheet provided to Halusan showing multiple alternative compensation "options," and a December 27, 2013 email reflecting a counter-proposal from Halusan, Halusan did not execute any written documents acknowledging a change to his employment contract. He continued to receive all compensation owed to him under the contract—including commissions—for 2013, 2014, and the first half of 2015. Scan Group stopped paying Halusan a monthly commission in July of 2015. It did not pay him an annual bonus for 2015, which would have been payable in 2016, or any annual bonus thereafter.

¶7    More than two years after Halusan's above-mentioned conversation with Scan Group's business manager, on February 5, 2016, Scan Group changed Halusan's title from "Sales Manager" to "Account Executive." Scan Group's president sent an email to all Scan Group employees on this date informing them of a "management change" pursuant to which two individuals (not Halusan) would become co-general managers and have responsibility for managing "all aspects of business" including "the customer facing side of things." Halusan stopped performing managerial duties as of this date.

¶8    More than three years after this change in Halusan's role, on November 22, 2019, Scan Group reduced Halusan's annual salary—without Halusan's permission or consent—from $125,000 to $100,000. Finally, on August 14, 2020, Scan Group terminated Halusan's employment by written letter. This letter set forth what Halusan could expect regarding dates of his final payments, including a payment on "September 11, 2020 – Per Employment Agreement – 10 days of pay."

¶9      On October 6, 2020, Halusan demanded that Scan Group pay him all money owed under the terms of the contract, which he then estimated to be $215,687.  Scan Group refused this demand and an additional demand dated November 19, 2020, prompting Halusan to file the underlying lawsuit.

¶10     After the trial court's denial of Scan Group's motion to dismiss and some discovery, Halusan filed a motion for summary judgment.  Scan Group responded to the motion for summary judgment with an argument (among others) that Halusan's claims were barred by the doctrine of laches, asserting that Halusan "delayed filing his claim for more than eight (8) years" after he was "verbally informed … that effective January 1, 2014, Scan [Group] would no longer pay [Halusan] Bonuses or Commissions."  The court denied both Halusan's motion for summary judgment and Scan Group's invitation to apply the doctrine of laches, determining that Scan Group had failed to point to specific evidence of prejudice from any delay.[2]

¶11     The court conducted a two-day bench trial during which it heard testimony from multiple witnesses, including Scan Group's majority owner, Scan Group's business manager, and Halusan—who the court deemed "credible as to all matters he testified" about.  At the close of evidence, Halusan orally moved the court for permission to amend his complaint to include a claim for a declaration that his contract with Scan Group satisfied Wisconsin's Statute of Frauds, WIS. STAT. § 241.02(1)(a), and therefore could not be orally modified.  In its findings of fact and conclusions of law, the court granted that motion.  It determined that the

_____

[2] The trial court also determined that the parties explicitly waived any defenses based on delay in their contract, which provided that "[n]o failure or delay on the part of any party … in exercising any right, power or remedy [under the contract] shall operate as a waiver thereof."

contract was subject to the Statute of Frauds. The court further concluded that Scan Group breached the contract and that Halusan was an employee of Scan Group from February 5, 2016, until his termination on August 14, 2020. The court awarded damages to Halusan totaling $236,312.51 as follows, along with attorney fees and costs:

(1) unpaid salary with statutory penalty: $42,567.00

(2) unpaid commissions with statutory penalty: $78,318.68

(3) unpaid bonus with statutory penalty: $91,045.83

(4) contractual earned payout with statutory penalty: $24,381.00

¶12 After entry of judgment, Halusan moved the trial court pursuant to WIS. STAT. § 805.17(3) to add a conclusion stating that, "even if the Statute of Frauds had not applied to the Employment Agreement, Scan Group still materially breached the Employment Agreement with Halusan and Halusan is still entitled to his damages as a result." Over Scan Group's objection, the court granted this motion and so amended its findings of fact and conclusions of law.

¶13 Scan Group appeals. It does not argue that any of the trial court's factual findings (neither those appearing above nor those included in the discussion below) are in error; instead, it argues that the court erred as a matter of law by precluding Scan Group from raising the doctrine of laches as an affirmative defense at trial; by declaring that the employment contract between Scan Group and Halusan fell within the statute of frauds and was materially breached by Scan Group; and by concluding that Halusan was an "employee" as that term is defined in Wisconsin's Wage Act. Finally, Scan Group argues that the court erred in awarding damages of $236,312.51, which it argues are either prohibited by the contract or unsupported by credible evidence in the Record.

## II. Discussion

¶14 We address each of Scan Group's arguments in turn.

### A. Laches

¶15 The equitable doctrine of laches provides an affirmative defense "to bar relief when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim." *Wisconsin Small Bus. United, Inc. v. Brennan*, 2020 WI 69, ¶11, 393 Wis. 2d 308, 946 N.W.2d 101. In Wisconsin, a party seeking application of laches must prove three elements: (1) that the claimant unreasonably delayed in bringing the claim; (2) that the defendant lacked knowledge that the claim would be brought; and (3) that the delay resulted in prejudice to the defendant. *Id.*, ¶12. Whether these elements are met is a question of law that we review independently. *Zizzo v. Lakeside Steel & Mfg. Co*, 2008 WI App 69, ¶6, 312 Wis. 2d 463, 752 N.W.2d 889. Even if all three elements are established, application of the doctrine is left to the sound discretion of the trial court. *Brennan*, 393 Wis. 2d 308, ¶12.

¶16 We begin with the third prerequisite element: prejudice. With respect to this element, Scan Group made the same argument in its briefing to this court that it made in opposing Halusan's motion for summary judgment and in urging the trial court to apply laches: "Halusan delayed filing suit *for over eight years* while his damages ballooned," and if he had "brought suit within a reasonable time … Scan Group could have – and assuredly would have – taken steps to lessen its potential exposure."

¶17 We independently reach the same conclusion reached by the trial court regarding this element: Scan Group has not pointed to evidence sufficient to

support a finding of prejudice as a matter of law. There is no basis for the assertion that Halusan delayed bringing his suit for eight years, given that the underlying lawsuit was filed in February 2021 (after Scan Group rejected an October 2020 demand) and the first time Scan Group failed to pay compensation allegedly owed under the contract—the first time Halusan could have possibly had a cognizable claim—was in July 2015.[3] Moreover, Scan Group does not explain what it "could have" or "assuredly would have" done to reduce its exposure had Halusan made his claim earlier. Indeed, Scan Group only "vaguely cit[es] additional damages accrued by Mr. Halusan."

¶18     Thus, regardless of whether the parties agreed to waive defenses based on delay in their contract—another basis for the trial court's conclusion— we affirm the order rejecting the affirmative defense of laches based on Scan Group's failure as a matter of law to establish the required element of prejudice from any delay on Halusan's part.

### B.     Breach of Contract

¶19     Scan Group urges us to reverse the trial court's declaration that the contract underlying Halusan's claims is subject to the statute of frauds and argues that it terminated Halusan's contract on one of two different dates before

---

[3] We note that Halusan filed suit within six years of this breach as required by the applicable statute of limitations, WIS. STAT. § 893.43. Scan Group correctly points out that laches may operate even when a claim is filed within the statute of limitations; "[w]hat constitutes a reasonable time [for raising a claim] will vary and depends on the facts of a particular case." *Wisconsin Small Bus. United, Inc. v. Brennan*, 2020 WI 69, ¶14, 393 Wis. 2d 308, 946 N.W.2d 101. But Scan Group does not seem to appreciate that there were no damages to allege prior to mid-2015, when it first stopped paying Halusan the amount earned according to the terms of the contract, and that damages were not "ballooning" for eight years prior to the initiation of the underlying suit but, as will be discussed more fully below, consisted of a relatively modest deficiency in pay until years later.

August 14, 2020, when it terminated Halusan's employment in writing: in late fall or early winter of 2013, when Scan Group's business manager verbally told Halusan that the agreement was "done," or on February 5, 2016, when Scan Group's president emailed all employees about the "management change" and Halusan's role was changed from "Sales Manager" to "Account Executive."

¶20 Again, Scan Group does not assert that any of the trial court's factual findings are clearly erroneous, *see* WIS. STAT. § 805.17(2), but that each of the 2013 and 2016 incidents constituted termination of the contract in substantial conformance with its terms such that the contract was not in force well before Halusan's termination of employment from Scan Group. Accordingly, Scan Group argues that Halusan's breach of contract claim must fail. To evaluate a claim for breach of contract, a court must determine whether a valid contract existed, whether a party violated the contract's terms, and whether any such violation was material such that it resulted in damages. *Riegleman v. Krieg*, 2004 WI App 85, ¶20, 271 Wis. 2d 798, 679 N.W.2d 857. These are legal questions that we review de novo; while "we consider the [trial] court's interpretation, we owe no deference to" it. *See Edwards v. Petrone*, 160 Wis. 2d 255, 258, 465 N.W.2d 847 (Ct. App. 1990).

¶21 Starting with the events of late 2013, Scan Group asserts that it was "not obligated to strictly comply with the written notice provision" in the contract because its business manager's oral statement that the contract was "done" constituted substantial compliance with the contract's notice requirement and was sufficient to prevent automatic renewal. Scan Group admits that the alleged notice was given less than sixty days prior to expiration of the term ending November 10, 2013, but asserts that the late-2013 notice served to prevent automatic renewal of the contract after the following term, which ended on November 10, 2014. It

stresses the maxim that "the law does not require a person to do a useless act." *See De Salvo v. Howell Plaza, Inc.*, 38 Wis. 2d 167, 172-74, 156 N.W.2d 473 (1968) (noting that a party need not have applied for a license that was a condition precedent to a lease—and so would have voided the lease if it could not be attained—if application would have been futile, but summary judgment was inappropriate because it was not "beyond dispute" that the license could not have been procured).

¶22 We cannot conclude that written notice in this case would have been "useless" as Scan Group asserts. Scan Group cites *Couture v. Hebert*, 42 A.2d 691, 692 (N.H. 1945), a New Hampshire case that it characterizes as "nearly identical," in which oral notice of termination—after which the employee "understood he was through working" and "did not at any time thereafter report for duty"—was deemed sufficient to terminate an employment agreement even though that agreement required written notice of termination. "The oral notice in [*Couture*] gave the plaintiff all the information he would have received had a written notice been given" because "[h]e understood he was through, and acted accordingly." *Id.* at 693.

¶23 In obvious contrast, the facts found by the trial court in this case do not establish that Scan Group gave notice—even oral notice—of its intention to stop automatic renewal of the contract after the term that would end roughly a year after the relevant conversation between Halusan and Scan Group's business manager occurred. To the contrary, the business manager's oral statement and the back-and-forth between Scan Group and Halusan in this timeframe show a desire on the part of Scan Group to modify Halusan's compensation terms and, as Scan Group's business manager testified at trial, that Scan Group was "amenable to negotiating this."

¶24 Scan Group gave Halusan a spreadsheet reflecting multiple options for compensation after the conversation, which Halusan characterized in his December 27, 2013 email as an "offer" that he rejected before providing his own proposal for a "deal." But unlike whatever communications led to the modification of Halusan's contract that was executed in writing by both parties in 2011, the negotiations in late 2013 did not lead to any new "deal" or modification of the agreement, let alone a written modification. The failure to reach a new agreement left the old agreement in place, as evidenced by the fact that Halusan simply continued to be paid according to the compensation plan in his contract—even after the expiration of the term ending November 10, 2014.[4]

¶25 Nor can we conclude that Halusan waived the requirement that notification of non-renewal be in writing. Waiver occurs where a party's conduct or silence "authorizes the inference" that it intends to waive another's obligation. *See* **Connell v. Milwaukee Mut. Fire Ins. Co.**, 18 Wis. 387, 393 (1864). Scan Group argues that Halusan waived strict compliance with its obligation to provide written notice after the "negotiations in the fall of 2013" by both affirmative conduct and silence. The affirmative conduct upon which it relies is Halusan's application for and acceptance of "incentive billing" payments totaling nearly $7,000 in 2014-15, which were characterized by Halusan as a "win/win" in his

---

[4] Scan Group also cites **Local 756 Int'l Union, UAW v. Le Roi Div., Westinghouse Air Brake Co.**, 274 Wis. 538, 540, 542, 80 N.W.2d 285 (1957), in which our supreme court's conclusion that the union's notice that it "desired modifications" was sufficient to prevent automatic renewal of the contract at issue there. This case is irrelevant at least for the reason that the contract at issue therein provided that it would renew each year "unless either party shall give notice in writing … of its *desire to make changes*, amendments, or to terminate same." **Id.** at 540 (emphasis added). No similar provision exists in Halusan's contract. *See also* **Socony-Vacuum Oil Co.**, 100 N.L.R.B. 90, 90-91 (1952) (discussing a contract that would renew absent "notice to terminate, modify, amend, or supplement").

December 27, 2013 email proposal of a new compensation plan and which were not owed to him under the terms of his contract. We cannot conclude that acceptance of these payments, which were "over and above whatever other commissions" salespeople were earning, earned by "most salespeople" at the company, and not prohibited by Halusan's contract, was a waiver of Scan Group's obligation to give written notice of non-renewal of the contract. Nor can we conclude that Halusan's silence—his failure to inform his supervisors of his belief that the contract was enforceable or that he was owed additional money under the contract after January 1, 2014—operated as a waiver of the written notice requirement as Scan Group argues, particularly when he continued to receive all payments due under the contract until at least July 2015.

¶26    Scan Group's arguments regarding the events of 2016 fare no better. The company asserts that Halusan's role change from Sales Manager to Account Executive "coupled with [the] *written* e-mail to Halusan and others regarding the '**Management Change**,' substantially complied with the Agreement's Termination provision" because this "demotion" was essentially a termination of Halusan's previous employment and offer of employment in a new position.[5] Again, Scan Group argues that Halusan's conduct (performing solely the duties of an account executive and ceasing managerial duties, reporting to one of the general managers of the company instead of to the president, receiving new business cards that referred to him as an "Account Executive" instead of a "Sales

---

[5] Scan Group cites a Mississippi case, *Jackson Pub. Sch. Dist. v. Mason*, 295 So. 3d 484 (Miss. Ct. App. 2019), in support of this argument. Even setting aside the fact that this case is from another jurisdiction and therefore nonbinding on this court, we conclude the case is not applicable for multiple reasons, including that its holding turned on state statutes specific to Mississippi. *See id.* at 491-92.

Manager"), and his silence (never informing his supervisors of his belief that the contract was in force or that he was owed money under it) constituted waiver of Scan Group's obligation to strictly comply with providing a fifteen-day written notice of termination of employment.

¶27    As the trial court noted, the company-wide February 5, 2016 email does not say Halusan's contract was terminated.  Nor did the oral discussion Scan Group says it had with Halusan preceding the email include any mention of termination.   In his trial testimony, Halusan described this discussion as a "30-second meeting" with two of Scan Group's executives in which he was told he would no longer "have to worry about the day-to-day … managing of sales."[6] The email and alleged discussion are entirely consistent with the contract's language that Halusan would have "duties and responsibilities … as may be, from time to time, assigned to him by the Company."

¶28    As the trial court also found, and Scan Group does not contest, Halusan "performed all of the duties of Exhibit A … of his Employment Agreement"—which is sub-titled "Account Executive Position Description"— "even after his position as Sales Manager at Scan Group ceased in January of 2016."   On its face, Article III of the contract, which addresses compensation, does not mention the title of "sales manager" or tie compensation to that role. Indeed, the contract does not make compensation contingent on performing managerial duties, which are listed nowhere therein.  Thus, we cannot conclude

---

[6] The trial court deemed Halusan "credible as to all matters he testified to," and Scan Group's president's testimony regarding this discussion is not in conflict with Halusan's; it does not mention any discussion of Halusan's contract in the early 2016 conversation regarding Halusan's role change.

that Scan Group gave notice that Halusan's employment under the contract was terminated in substantial compliance with its terms, or that Halusan waived its obligation to adhere to those terms either by performing the duties of an account executive beginning in 2016 or by failing to communicate that he believed he was owed additional money pursuant to the contract—particularly when his salary was unchanged until 2019 and the deficiency in commissions and annual bonuses was still relatively modest at this point.

¶29     Thus, independent of the statute of frauds, we conclude that neither Scan Group's oral communication to Halusan in 2013 nor its email regarding the "management change" in 2016 constituted termination of Halusan's employment contract.  We affirm the trial court's judgment with respect to Halusan's claim for breach of contract and need not reach the question of whether the contract at issue was subject to the statute of frauds.

### C.     Wisconsin Wage Act Claim

¶30     Having concluded that Scan Group is liable for payments due to Halusan under his written employment contract through his termination on August 14, 2020, we turn to the question of whether its withholding of those payments violated Wisconsin's Wage Act, WIS. STAT. § 109.03.  The application of a statute to a particular set of facts is a question of law that we review de novo. ***Kenosha Fire Fighters, Local Union No. 414, AFL-CIO v. City of Kenosha***, 168 Wis. 2d 658, 663, 484 N.W.2d 152 (Ct. App. 1992).

¶31     The statute provides that "[e]very employer shall as often as monthly pay to every employee engaged in the employer's business … all wages earned by the employee to a day not more than 31 days prior to the date of payment."  WIS. STAT. § 109.03(1).  "Employee" is defined in WIS. STAT. § 109.01(1r) as "any

person employed by an employer, except that 'employee' does not include … a person employed in a managerial, executive, or commissioned sales capacity or in a capacity in which the person is privy to confidential matters involving the employer-employee relationship." "[W]ages" are defined as "remuneration payable to an employee for personal services … agreed upon between the employer and the employee or provided by the employer to the employees as an established policy." Sec. 109.01(3). An employer that has improperly withheld wages in violation of this statute may be ordered, according to the trial court's discretion, to pay the employee, "in addition to the amount of wages due and unpaid … increased wages of not more than 50 percent of the amount of wages due and unpaid." WIS. STAT. § 109.11(2)(a); *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wis., S.C.*, 2005 WI App 217, ¶54, 287 Wis. 2d 560, 706 N.W.2d 667. The statutory penalty applies to wages that should have been paid within the two-year statute of limitation. *See* WIS. STAT. § 109.09(2)(b)(3).

¶32    Scan Group argues that Halusan was not an "employee" for purposes of his Wisconsin Wage Act claim because, even in his capacity as an account executive, he "was privy to confidential information" including project bids, communications and negotiations with clients, client satisfaction and troubleshooting data, and client organizational charts and contact information. It further argues that Halusan's remuneration was not "agreed upon" between February 25, 2019, and August 14, 2020, such that it cannot be considered "wages" under the law.

¶33    The latter argument depends upon a conclusion that Halusan's contract was either not renewed as of November 2014 or terminated in February 2016. It must be rejected since we have already determined, to the contrary, that the written contract was in force for the two years prior to Halusan's

termination and it reflects Scan Group's agreement to pay Halusan all of the compensation detailed in Article III.

¶34　Scan Group's argument regarding Halusan's status as an "employee" is as easily rejected. The trial court found as factual matters that, after he stopped serving as Sales Manager in February 2016, Halusan was not a "manager" of Scan Group but rather an "employee" as that term is defined in WIS. STAT. § 109.01(1r); he was not "an officer, director, shareholder, limited liability company, manager of Scan Group, [or] a person in a position who could access employee files." Although Scan Group argues in its brief to this court that Halusan was "privy to confidential information," it cites only eight lines of trial testimony from one of its managers stating that Scan Group's account executives operate in a software system in which information including its "entire customer base … past sales or total sales, all of [Scan Group's] estimates and all of the jobs [Scan Group has] done for all of [its] customers" is held and that Halusan would have had access to that information. Scan Group has not met the burden it carries on appeal to demonstrate that the trial court erred in either a factual finding or a legal conclusion. *See Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381 ("[O]n appeal 'it is the burden of the appellant to demonstrate that the [trial] court erred.'" (citation omitted)).

¶35　Because we conclude that the trial court's judgment as it relates to Halusan's Wisconsin Wage Act claim is not in error, Scan Group may be subject to the statutory penalty of 50% of Halusan's unpaid wages for the two years preceding his suit (for wages earned after February 25, 2019) as discussed below.

**D.     Damages**

¶36     Finally, we turn to the issue of damages.  Scan Group argues that the trial court erred in concluding that Halusan's damages were $236,312.51 for four reasons:   (1) the contract limits Halusan's recovery; (2) there is no credible evidence supporting an award of commissions over $59,179.31 or bonuses over $68,348.33; (3) Halusan was not entitled to an Earnout Payment under the contract; and (4) the court's award of the statutory penalty under the Wisconsin Wage Act was based on an incorrect understanding of the law and therefore constituted an erroneous exercise of discretion.  In this case, we conclude that the trial court erred only with respect to the amount of unpaid monthly commissions and the annual bonus for 2020, as explained more fully below.  We reverse with respect to those categories of damages, and affirm with respect to the rest of the court's award.

**1.     Contractual Limitation of Damages**

¶37     First, Scan Group contends that Article III, Section 6 limits Halusan's recovery in this action to $25,764.00.  This section provides that

> the payments contemplated by Article III, Paragraph 4 [which addresses "Severance Payments" and includes unpaid salary earned prior to the date of termination, vested bonus payments for the prior year, and unused vacation pay for the year of termination] shall constitute the exclusive and sole remedy for any termination of Executive's employment by the Company (whether pursuant to, or in violation of, the terms of this Agreement).

Scan Group asserts that Halusan's unpaid base salary, 2019 vested bonus, and unused vacation pay amount to $25,764.00, and that that is the most Halusan can be awarded for his claims.  Again, interpretation of a contract to determine the amount of damages due is an issue of law that we review de novo.  *See **Peterson v.***

*Cornerstone Prop. Dev., LLC*, 2006 WI App 132, ¶42, 294 Wis. 2d 800, 720 N.W.2d 716.

¶38 We conclude that Scan Group's interpretation of Article III, Section 6 is wrong. Immediately after the language quoted above, this section explicitly states that Halusan can pursue "an action to enforce the payments due to [Halusan] under this Agreement." Halusan's claims for breach of contract and failure to pay wages in violation of the Wisconsin Wage Act are not covered by this section, which applies only to damages associated with termination. Halusan was entitled to the damages from his breach of contract and unpaid wage claims regardless of whether a termination occurred. A plain reading of this section makes clear that it is not in conflict with the damages awarded to Halusan in this case.

## 2. Unpaid Monthly Commissions and Annual Bonuses

¶39 Next, Scan Group takes issue with the evidence supporting the amount of unpaid commissions and bonuses to which Halusan was entitled. Awards of compensatory damages are reviewed under "a highly deferential standard" and are upheld "if there is any credible evidence which under any reasonable view supports" the award. *Selmer Co. v. Rinn*, 2010 WI App 106, ¶28, 328 Wis. 2d 263, 789 N.W.2d 621.

¶40 The trial court awarded $65,739.00 in unpaid monthly commissions, which includes 1.5% of Halusan's sales from 2016 and 2017 (which the parties agree did not exceed the $550,000 threshold for triggering the 2.5% commission) and 2.5% for years 2015 and 2018-20. Scan Group argues that there is no credible evidence that Halusan's sales exceeded $550,000 for 2015 or 2020, and that Halusan should be awarded 1.5% rather than 2.5% for those years—a difference of

$6,559.69. Halusan responds that the trial court "barred Scan Group from making this argument" because of "Scan Group's refusal to cooperate in discovery." He cites the court's post-trial order amending its conclusions of law, but that order mentions neither damages nor discovery and appears to be irrelevant to this issue. The court did grant Halusan's motion in limine precluding Scan Group from calling its own witnesses at trial "to testify as to Halusan's damages calculation," but that order explicitly stated that "Scan [Group] does not lose the ability to cross examine Halusan about his calculations" or to "offer its own testimony, if admissible, through its employees as to the compensation it did pay to Halusan"—which shows that Scan Group was (and is) entitled to dispute Halusan's calculations.

¶41 Our search of the Record shows ample credible evidence that Halusan's sales in 2015 were in excess of $550,000; an exhibit admitted at trial showed sales of $569,117.47, and Scan Group's human resources officer testified as to its accuracy. Thus, there is no error in the trial court's awarding of 2.5% commission for 2015 sales. However, Halusan himself asserted (and the trial court found)[7] that his sales for 2020 (up to the point of his termination of employment) were less than $550,000. Halusan points to no credible evidence justifying the court's award of 2.5% commission on sales of $421,163.30. We therefore reverse the damages award based on monthly commissions and direct the trial court to reduce Halusan's award by $4,211.63 to reflect the appropriate 1.5% commission on 2020 sales.

---

[7] The trial court relied on Halusan's exhibit showing 2020 sales of $418,195.00 in determining the total of his unpaid monthly commissions.

¶42     Turning to annual bonuses, Scan Group asserts that the trial court's award of unpaid bonuses—1.5% of Scan Group's annual sales exceeding $7 million, which amounted to $78,190.00 from 2015-2020—was in error because: (1) two months of the 2015 bonus included in that sum were earned prior to February 25, 2015, when the statutory period began to run; and (2) Halusan's 2020 bonus included in that sum was not vested and payable because his employment had been terminated before the end of that year.  Scan Group is correct on the latter point, but not on the former.  The statute of limitations applicable to a claim begins to run only when a party suffers actual damage.  *Hennekens v. Hoerl*, 160 Wis. 2d 144, 155, 465 N.W.2d 812 (1991).  The very first day Halusan could theoretically have sued Scan Group for non-payment of his 2015 annual bonus was on January 1, 2016; he could not even have calculated what he was due before that date.  Thus, his entire 2015 annual bonus under the contract falls within the statute of limitations, and we affirm the trial court in that respect.

¶43     But, under the explicit terms of his contract, Halusan is not entitled to a bonus on the company's sales in excess of $7 million for the year 2020 given that his employment was terminated before the end of that year.  The contract provides that "[i]f Executive's employment … is terminated on an involuntary basis … Executive shall have no further rights against the Company … except for the right to receive… any vested rights under Bonus Plan (if any) *for the prior year*."  (Emphasis added.)  Again, we reverse the damages award based on Halusan's annual bonus for 2020 and direct the trial court to reduce his award by $8,250.00 to reflect only the vested annual bonuses due from sales for the years 2015-2019.

### 3.  Contractual Earnout Payment

¶44    The next area of dispute concerns the "Earnout Payment" granted to Halusan based on Article IV, Section 2 of his contract.  This amounted to $16,245.00 of the trial court's award (without statutory penalty) and represents one-half of the "Historical Commission Rate that would otherwise be due for all sales to customers originated and serviced by Executive during the period of one year prior to his termination" for a period of six months after involuntary termination.  Scan Group does not argue about the amount calculated by the trial court but says that Halusan is not entitled to the payment because his failure to inform Scan Group of his intention to seek it until the day before trial "constitutes trial by ambush."

¶45    We affirm the award of the Earnout Payment for at least the reason that Scan Group fails to develop any argument supporting its reversal.  *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (declining to address arguments unsupported by legal reasoning and legal authority).  Scan Group cites no authority for its contention that the trial court's "permitting Halusan to submit evidence of the Earnout Payment at trial" was an "[erroneous exercise of] discretion," nor does it cite the trial court's decision on this issue[8] or provide any response to the court's rationale for allowing Halusan to seek these contractual damages.  Our search of the Record reveals that the trial court allowed the evidence based on its determination that Halusan's "complaint itself says [he was] seeking judgment for all damages under the contract, and the earn-out is a

---

[8] Scan Group cites only the page of the trial transcript where it raised an objection to Halusan introducing evidence regarding this payment.

damage under the contract." Scan Group has not met the appellant's burden of convincing us that the court erred with respect to this issue. *See Gaethke*, 376 Wis. 2d 448, ¶36.

### 4. Statutory Penalty under WIS. STAT. § 109.11(2)(a)

¶46 Finally, we reach the issue of the statutory penalty of 50% of unpaid wages that may be imposed, according to the trial court's discretion, under the Wisconsin Wage Act. Scan Group argues that the court erroneously exercised its discretion in awarding this statutory penalty because its statement that "Halusan's claim for wages under Wisconsin's Wage Claim Statute grants him enhanced damages of 50% for the last 2 years of employment with Scan Group" shows it erroneously viewed the penalty as mandatory rather than discretionary and because it did not adequately articulate its reasoning for awarding the penalty.

¶47 "We generally look for reasons to sustain discretionary decisions," and "[w]hen the trial court's reasoning is inadequate or incomplete, we may independently review the record to look for additional reasons to support the court's exercise of discretion." *Wolnak*, 287 Wis. 2d 560, ¶55. Here, the court made sufficient findings to provide a reasonable basis for its award. Among them, it noted that Scan Group referenced Halusan's contract—the only one he had ever had with Scan Group—and stated it would pay him ten days of pay "Per Employment Agreement" in Halusan's August 2020 termination letter. This certainly undercuts Scan Group's argument to this court that "good cause for its failure to make payments" existed, namely that it "reasonably believed that the Agreement was not renewed in 2013."

¶48 Moreover, Scan Group's support for the premise that it is an erroneous exercise of discretion to award statutory penalties against an employer

that provides good cause for its failure to make payments is itself shaky. Scan Group relies on *American Federation of State, County, and Municipal Employees Local 1901 v. Brown County*, 146 Wis. 2d 728, 740, 432 N.W.2d 571 (1988). But in that case, our supreme court actually stated that "Chapter 109, if applied, would impose civil penalties regardless of the reason for any delay greater than 31 days in paying retroactive wages"; it declined to apply chapter 109 because it determined that the good faith exception provided in another statute applied to the case. *Id.* at 735; 739; *see also Johnson v. Roma II-Waterford LLC*, 2013 WI App 38, ¶¶46-52, 346 Wis. 2d 612, 829 N.W.2d 538 (stating that a trial court may exercise its "broad discretion" to award a penalty under ch. 109 if the record shows "wrongful withholding of wages for dilatory or other unjust reasons" and holding that a court's denial of the penalty was an erroneous exercise of discretion when its findings "may easily be read to imply" that the employer acted in a dilatory or unjust manner (citation omitted)).

¶49 Scan Group has not met its burden to show that the trial court's award of the statutory penalty under WIS. STAT. § 109.11(2)(a) constituted an erroneous exercise of discretion. We affirm the court's award in this respect except insofar as the court applied the penalty to the compensatory damages discussed above—the 2.5% commission on 2020 sales and the 2020 annual bonus—which we concluded were unsupported by the Record and reversed on that basis.

### III. Conclusion

¶50 For the foregoing reasons, we affirm the trial court's order prohibiting the application of laches as an affirmative defense and its judgment with respect to Halusan's breach of contract and Wisconsin Wage Act claims. We

23

reverse the court's award of damages only insofar as it includes a 2.5% rather than 1.5% commission on Halusan's 2020 sales and the payment of Halusan's 2020 bonus. We remand with directions to the trial court to amend its damages award (and adjust its statutory penalty) accordingly.

*By the Court.*—Order affirmed; judgment affirmed in part, reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.